**Slip Op. 02-131**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FORMER EMPLOYEES OF CHEVRON PRODUCTS COMPANY, | : |
| | : |
| *Plaintiffs*, | : |
| | Court No. 00-08-00409 |
| v. | : |
| | : |
| UNITED STATES SECRETARY OF LABOR, | : |
| | : |
| *Defendant*. | : |

[Plaintiffs' motion for judgment on the agency record granted in part, and action remanded to Defendant for further proceedings consistent with opinion.]

Decided: October 28, 2002

Meeks & Sheppard, (Ralph H. Sheppard and Diane L. Weinberg), for Plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, and Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Henry R. Felix); Louisa Reynolds, Office of the Solicitor, U.S. Department of Labor, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

In this action, Plaintiffs – former employees of the Roosevelt Terminal division of Chevron Products Company ("the Roosevelt Workers") – contest both the denial of their petition for adjustment assistance benefits under the North American Free Trade Agreement ("NAFTA") Implementation Act and the determination of the U.S. Department of Labor ("Labor Department")

declining to reconsider its denial of that petition, as well as the agency's separate determination denying them benefits as secondarily-affected workers under the Statement of Administrative Action accompanying the NAFTA Implementation Act.

Pending before the Court is Plaintiffs' Motion for Judgment on the Agency Record, which seeks "an order reversing [the Labor Department's] determinations and awarding adjustment assistance" or, in the alternative, a remand to the Department for further investigation. *See* Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record ("Plaintiffs' Brief") at 2, 8, 12-13; Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Plaintiffs' Reply Brief") at 4, 5. The Government opposes Plaintiffs' motion and urges that the Labor Department's determinations be sustained as supported by substantial evidence in the record and otherwise in accordance with law. *See* Defendant's Response in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record ("Defendant's Brief") at 1, 11, 29.

Jurisdiction lies under 28 U.S.C. § 1581(d)(1) (1994). For the reasons set forth below, the administrative record in this matter is inadequate to support a determination on the Roosevelt Workers' eligibility for NAFTA-TAA benefits. Plaintiffs' Motion for Judgment on the Agency Record is therefore granted in part, and the action is remanded to Defendant for further proceedings consistent with this opinion.

# I. Background

## A. The Trade Adjustment Assistance Laws

As the court noted in Int'l Union v. Marshall:

> The Trade Act of 1974 was intended "to foster the economic growth of and full employment in the United States and to strengthen economic relations between the United States and foreign countries through open and nondiscriminatory world trade," while, at the same time, providing "adequate procedures to safeguard American industry and labor against unfair or injurious import competition, and *to assist industries, firm[s], workers, and communities to adjust to changes in international trade flows*."

Int'l Union v. Marshall, 584 F.2d 390, 391 (D.C. Cir. 1978) (emphasis added) (*quoting* 19 U.S.C. § 2102(1), (4) (1976) ).  The court explained the purpose of the Trade Adjustment Assistance ("TAA") Program established by the 1974 Act:

> Congress was of the view that fairness demanded some mechanism whereby the national public, which realizes an overall gain through trade readjustments, can compensate the particular industries and workers who suffer a loss much as the doctrine of eminent domain requires compensation when private property is taken for public use.  Otherwise the costs of a federal policy that conferred benefits on the nation as a whole would be imposed on a minority of American workers and industries.

*Id*. at 395 (citations omitted).  Under the TAA program, displaced workers are eligible for a variety of trade adjustment assistance benefits, designed to "encourage workers who are unemployed because of import competition to learn the new skills necessary to find productive employment in a changing American economy."  S. Rep. No. 100-71, at 11 (1987).

Similarly, Congress and the Administration recognized that – while NAFTA would "result in net economic benefits and increased job opportunities" for workers in the United States – "some workers [would] have to find new employment."  *See* Statement of Administrative Action

Accompanying NAFTA Implementation Act ("Statement of Administrative Action"), H.R. Doc. No. 103-159, vol. 1 at 672 (1993). Drawing on "the best aspects of existing programs," the NAFTA Transitional Adjustment Assistance ("NAFTA-TAA") Program[1] established under the NAFTA Implementation Act was deemed "essential" to "provide affected workers with both rapid and early intervention and the ability to engage in long term training while receiving income support." *Id*. Much like trade adjustment assistance available under the Trade Act of 1974, the NAFTA-TAA program entitles certain workers whose job losses are attributable to increased import competition from (or shifts in production to) Canada or Mexico to receive benefits including employment services, appropriate training, job search and relocation allowances, and income support payments. *See id.* at 673-74; 19 U.S.C. § 2331(d) (1994).

To qualify for NAFTA-TAA benefits, a group of workers or their union or other authorized representative must file with their Governor (generally through appropriate state labor authorities) a petition for certification of eligibility to apply for adjustment assistance. After 10 days, the state forwards its preliminary findings and recommendation to the Labor Department, which conducts an investigation and reaches a final determination on the petition. 19 U.S.C. § 2331(b)-(c) (1994).

The trade adjustment assistance statutes are remedial legislation and, as such, are to be construed broadly to effectuate their intended purpose. Woodrum v. Donovan, 5 CIT 191, 198, 564 F. Supp. 826, 832 (1983) (*citing* United Shoe Workers of Am. v. Bedell, 506 F.2d 174, 187 (D.C.

---

[1]Benefits available under the program established by the Trade Act of 1974 are denominated "*trade* adjustment assistance," while those available under the NAFTA Implementation Act are referred to as "*transitional* adjustment assistance." Both programs are generally referred to herein as "trade adjustment assistance," except where specifically indicated.

Cir. 1974) ), *aff'd*, 737 F.2d 1575 (Fed. Cir. 1984); *see also* Former Employees of Champion

Aviation Prods. v. Herman, 23 CIT 349, 352 (1999) (citations omitted) (NAFTA-TAA statute is

remedial legislation, to be construed broadly).  Moreover, both "because of the *ex parte* nature of

the certification process, and the remedial purpose of [the statutes], the [Labor Department] is

obliged to conduct [its] investigation with the utmost regard for the interests of the petitioning

workers."  Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (*citing* Abbott

v. Donovan, 7 CIT 323, 327-28, 588 F. Supp. 1438, 1442 (1984) (quotations omitted) ("Abbott II")).

    Thus, while the Labor Department is vested with considerable discretion in the conduct of

its investigation of trade adjustment assistance claims, "there exists a threshold requirement of

reasonable inquiry.  Investigations that fall below this threshold cannot constitute substantial

evidence upon which a determination can be affirmed."  Former Employees of Hawkins Oil and Gas,

Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993).[2]

---

[2]*See*, *e.g.*, Hawkins Oil and Gas, 17 CIT at 130, 814 F. Supp. at 1115 (castigating agency for "a sloppy and inadequate investigation" which was "the product of laziness," and holding that a fourth remand would be "futile"); Local 116, Int'l Union of Electronic, Electrical, Salaried, Machine and Furniture Workers v. U.S. Sec'y of Labor, 16 CIT 490, 493-94, 793 F. Supp. 1094, 1096-97 (1992) (criticizing agency efforts as "cursory at best," and finding that "there was actually no investigation done whatsoever"); Former Employees of Alcatel Telecomms. Cable v. Herman, 24 CIT ____, ____, No. 98-03-00540, Slip Op. 00-88, 2000 Ct. Intl. Trade LEXIS 90, at *24-26 (2000) (concluding that "the administrative record reveal[ed] no more than an inadequate investigation lacking detail" where, *inter alia*, agency based its negative determination on responses to wrong type of questionnaire and failed to verify accuracy of company's questionnaire responses); Former Employees of Swiss Indus. Abrasives v. United States, 17 CIT 945, 949-50, 830 F. Supp. 637, 641-42 (1993) ("Swiss Indus. Abrasives I") (characterizing agency's actions as "unreasonable" and its investigation as "misguided and inadequate at best" where agency, *inter alia*, failed to clarify important aspects of information provided by company, relied on company's unsubstantiated statements on critical point, and ignored other relevant information).

## B.  The Facts of This Case

The Labor Department's denial of the Roosevelt Workers' petition for NAFTA-TAA benefits – the action at issue here – has its roots in the Department's denial of the Roosevelt Workers' earlier petition for assistance under the Trade Act of 1974.  Upon receipt of that petition ("the TAA petition"), the Labor Department initiated an investigation, and sent Chevron Products Company ("CPDS") a standard form TAA "Business Confidential Data Request" questionnaire.  *See* AR 11.[3] CPDS's Human Resources Manager – Irene D. Aviani – responded to the questionnaire, describing the Roosevelt Workers, in essence, as truck drivers, and providing certain other information concerning (1) the company's organizational structure; (2) the company's sales, production and employment; (3) company imports and layoffs; (4) any transfers of production; and (5) the company's major declining customers.  *See* CAR 13-15.

Based on its investigation, the Labor Department denied the Roosevelt Workers' petition for TAA, finding that they were engaged in the performance of services and, thus, did not produce an article within the meaning of the TAA statute.  AR 16 (Notice of Negative Determination Regarding Eligibility To Apply For Worker Adjustment Assistance (Feb. 17, 2000) ).  The Labor Department further found that the reduction in demand for the workers' services did not originate at a production facility whose workers independently met the statutory criteria for certification.  AR 16-17.

---

[3]Because the administrative record in this action includes confidential information, two versions of that record were prepared.  Citations to the public administrative record are noted as "AR ____," while citations to the confidential version are noted as "CAR ____."  The sole difference between the two is that pages 13 through 15 – the "Business Confidential Data Request" questionnaire completed by CPDS's Human Resources Manager – are omitted from the public version, because they include business confidential information.

Seeking to appeal the Labor Department's denial of their TAA petition, the Roosevelt Workers sought the assistance of representatives of the State of Utah's Department of Workforce Services. AR 4. In the process of preparing the appeal, the Utah officials learned for the first time "that Chevron had been buying Canadian oil." AR 4. In light of the Canadian imports, a new petition was filed – this time seeking NAFTA-TAA benefits. AR 1-5 (Petition for NAFTA Transitional Adjustment Assistance, with attachments). It is that NAFTA-TAA petition which is at issue here.

According to the NAFTA-TAA petition, before they were laid off, the Roosevelt Workers were employed as "gaugers," who went to "well head[s] and or crude oil tanks" to perform various tasks to determine whether crude oil should be purchased – "[c]hecking temperature, gaug[ing] the amount of crude in the tank, tak[ing] samples for gravity test and grind out for BS&W, and check[ing] the bottom of the tank for water or impurities." AR 3. The NAFTA-TAA petition further explained that, if the samples were satisfactory and all tests were passed, "a crude oil run ticket [was] written up" and "drivers [were] dispatched to the location . . . [to] load[ ] the crude oil on [their] truck[s] and transport[ ] it to one of three locations for refining." AR 3.

According to the NAFTA-TAA petition, an influx of lower-cost crude oil imported from Canada by Chevron and other companies led to dramatic cutbacks in domestic production. Those cutbacks in domestic production, in turn, resulted in a reduced demand for gaugers such as the Roosevelt Workers and – eventually – in the termination of their employment. AR 3.

Finally, the NAFTA-TAA petition stated that the Roosevelt Workers' former employer "suppl[ied] components/unfinished and semifinished goods" (specifically, crude oil) to "Chevron

USA," which then refined the crude into petroleum products. The Roosevelt Workers therefore claimed that they qualified for trade adjustment assistance as secondarily-affected workers, pursuant to the Statement of Administrative Action accompanying the NAFTA Implementation Act. AR 2.

Accompanying the NAFTA-TAA petition was an internal memorandum prepared by a representative of the State of Utah's Workforce Services Department, chronicling certain events leading up to the filing of that petition and documenting a significant "lack of cooperation from Chevron." AR 4. The memo noted that Chevron was "very hostile" to the Workforce Services Department representative who contacted the company concerning the Roosevelt Workers' TAA petition, stating that "it was none of her business." AR 4. The memo further noted that one Chevron official who had provided the Roosevelt Workers with much information "did not want them to use his name as he [was] worried about the negative effects from Chevron." AR 4.

The preliminary Findings and Recommendations of the State of Utah – including a finding that "[t]he Chevron company is receiving all crude products from Canada, causing the company in Roosevelt, Utah to layoff workers" – also were forwarded to the Labor Department. *See* Memorandum from State of Utah Department of Workforce Services to U.S. Department of Labor re: NAFTA-TAA Petition Preliminary State Investigation/Chevron (CPDS) (April 10, 2000) (Plaintiffs' Brief, Exh. 3). However, there is no indication that the Labor Department considered Utah's findings in reaching its determination. *See* Defendant's Brief at 27 (conceding that "it is unclear from the record whether the agency decisionmaker considered the preliminary findings prior to issuing his decision").

Relying exclusively on its earlier investigation, the Labor Department denied the Roosevelt Workers' NAFTA-TAA petition. With no further investigation, the agency again ruled that the workers "were engaged in lifting and transportation of crude oil to domestic refineries" and thus "were engaged in services and did not produce an article" within the meaning of the statute; nor did the "reduction in [the] demand for [their] services . . . originate at a production facility whose workers independently [met] the statutory criteria for certification." AR 10 (Findings of the [NAFTA-TAA] Investigation); AR 18-19 (Notice of Negative Determination Regarding Eligibility To Apply for NAFTA-Transitional Adjustment Assistance (April 24, 2000) ).[4] Notice of that negative determination was published May 11, 2000. AR 24 (Notice of Determinations Regarding Eligibility To Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 65 Fed. Reg. 30,442, 30,444 (May 11, 2000) ).

The Roosevelt Workers filed a timely application for administrative reconsideration of the denial of their NAFTA-TAA petition. *See* AR 29.[5] The application for reconsideration stated, in essence, that (1) the relatively low price of crude oil imported from Canada forced U.S. producers to reduce domestic activity, which resulted in a loss of demand by domestic oil producers for gaugers, leading to the Roosevelt Workers' separation; (2) an increase in imports of Canadian crude oil, including imports by Chevron, replaced lost production in the local area; (3) Chevron's

---

[4]Notices of the Labor Department's denial of the NAFTA-TAA petition were sent to the Roosevelt Workers the day after the determination. AR 20-23.

[5]In the same submission, the Roosevelt Workers also sought reconsideration of the Labor Department's denial of two TAA petitions. *See* AR 29. The Labor Department denied those aspects of the application for reconsideration on procedural grounds, and those denials are not challenged in this action. *See* AR 32.

replacement of locally-produced domestic oil with lower cost Canadian crude caused a reduced

demand for the Roosevelt Workers' services; (4) other trucking and non-producing entities have

been certified for trade adjustment assistance; (5) the Labor Department's determination was

premature because the State of Utah had not issued its preliminary findings of investigation; and (6)

the Labor Department official issuing denials of petitions in the first instance should not also be

responsible for the review of administrative appeals of those denials.  AR 29-30; *see also* AR 33-34.

In response to the application for reconsideration, a Labor Department investigator phoned

Ms. Aviani, the Human Resources Manager of Chevron Products Company ("CPDS"), sometime

in May 2000, to ask about "the type of work being performed by the[ ] workers at the Roosevelt Utah

facility."  *See* AR 31 (Memorandum to File (undated), from Rick Praeger (Labor Department), re:

"TA-W-37,240: Chevron Products Company, Roosevelt, Ut").  Ms. Aviani told the investigator that

"the workers drove trucks and would pick up or deliver crude."  AR 31.  When the investigator asked

whether the drivers did pick ups and deliveries only for Chevron wells, Ms. Aviani initially stated

that the wells were "either Chevron owned or 'partner' wells."  AR 31.  However, some time later,

she called the investigator back to retract her earlier statement, and reported instead that "95% of the

crude picked up by the drivers in Roosevelt . . . [was] from 3rd party wells in which Chevron did not

have a financial interest, other than purchasing the crude."  AR 31.

On July 21, 2000, the Labor Department denied the application for reconsideration, stating

that – according to its investigation – "there were no company imports of crude oil" but, rather, the

Roosevelt Workers were "engaged in lifting and transporting crude oil," and thus provided a service

and did not produce an article within the meaning of the statute.  AR 32-35 (Notice of Negative

Determination Regarding Application for Reconsideration (July 25, 2000) ). The Labor Department further ruled that the Roosevelt Workers did not satisfy the criteria applicable to service workers because (1) "[t]here were no NAFTA-TAA certifications in effect for workers of Chevron Products Company," and (2) the Roosevelt Workers "lifted and transported crude oil that was primarily purchased from unaffiliated firms."[6] *Id*. The Labor Department rejected the Roosevelt Workers' remaining contentions as well and, accordingly, sustained its original determination denying their eligibility for NAFTA-TAA. AR 35. Notice of the denial of reconsideration was published on August 1, 2000. AR 43 (Notice of Negative Determination Regarding Application for Reconsideration; Chevron Products Company, Roosevelt, UT, 65 Fed. Reg. 46,988 (Aug. 1, 2000)).

At the same time it denied reconsideration of its determination on the NAFTA-TAA petition, the Labor Department also issued a determination denying the Roosevelt Workers certification as a "secondarily-affected worker group" under the Statement of Administrative Action accompanying the NAFTA Implementation Act. AR 36 (Negative Finding Regarding Qualification as a Secondarily Affected Worker Group Pursuant to the Statement of Administrative Action Accompanying the NAFTA Implementation Act (July 21, 2000) ). That negative determination was based on the agency's findings that (1) "[t]he workers of Chevron Products Company in Roosevelt, Utah, are engaged in . . . employment related to lifting and transporting crude oil"; (2) "the majority of [the] crude oil lifted and transported by the Roosevelt workers [was] purchased from 3rd parties"; and (3) the workers did not "supply components, unfinished, or semifinished goods to a directly-

---

[6]Notices of the Labor Department's denial of the application for reconsideration were sent to the Roosevelt Workers the same day. AR 39-42.

affected ('primary') firm nor did they assemble or finish products made by a directly-affected firm."
AR 37.

This appeal followed.

## II.  **Standard of Review**

Judicial review of a Labor Department determination denying certification of eligibility for trade assistance benefits is confined to the administrative record.  *See*, *e.g.*, Champion Aviation, 23 CIT at 350 (*citing* 28 U.S.C. § 2640(c) (1994) *and* Int'l Union v. Reich, 22 CIT 712, 716, 20 F. Supp. 2d 1288, 1292 (1998) ).  The agency's determination must be sustained if it is supported by substantial evidence in the record and is otherwise in accordance with law.  19 U.S.C. § 2395(b) (1994); Swiss Indus. Abrasives I, 17 CIT at 947, 830 F. Supp. at 639 (*citing* Former Employees of Gen. Elec. Corp. v. U.S. Dep't of Labor, 14 CIT 608, 611 (1990) ).

The Labor Department's findings of fact are thus conclusive if they are supported by substantial evidence.  *See* Former Employees of Galey & Lord Indus., Inc. v. Chao, 26 CIT ____, ____, No. 01-00130, Slip Op. 02-74, 2002 Ct. Intl. Trade LEXIS 79, at *6 (2002) (citation omitted). However, substantial evidence is more than a "mere scintilla"; it must be enough to reasonably support a conclusion.  *Id.* at *7 (*citing* Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (1987) ).  And "[a]n assessment of the substantiality of record evidence must take into account whatever else in the record fairly detracts from its weight."  Former Employees of Swiss Indus. Abrasives v. United States, 19 CIT 649, 651 (1995) (*citing* Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ) ("Swiss Indus. Abrasives II").

Moreover, all rulings based on the agency's findings of fact must be "in accordance with the statute and not . . . arbitrary and capricious"; to that end, "the law requires a showing of reasoned analysis." Gen. Elec. Corp., 14 CIT at 611 (*quoting* Int'l Union v. Marshall, 584 F.2d at 396 n.26).

In short, although it is clear that the scope of review here is narrow, and that a court is not free to substitute its judgment for that of the agency, it is equally clear that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Alcatel Telecomms., 24 CIT at ____, ____, No. 98-03-00540, Slip Op. 00-88, 2000 Ct. Intl. Trade LEXIS 90, at *11 (*quoting* Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins., 463 U.S. 29, 43 (1983) (citations omitted) ). Where "good cause [is] shown," a case must be remanded for further investigation and analysis. *See* 19 U.S.C. § 2395(b) (1994); Former Employees of Linden Apparel Corp. v. United States, 13 CIT 467, 469, 715 F. Supp. 378, 381 (1989); Swiss Indus. Abrasives I, 17 CIT at 947, 830 F. Supp. at 640.

### III.  Analysis

As part of the NAFTA Implementation Act, lawmakers established a trade adjustment assistance program with two separate components, designed to provide benefits both for workers in firms "directly affected by imports from or shifts in production to Mexico or Canada" and for "workers in secondary firms that supply or assemble products produced by firms that are directly affected." Statement of Administrative Action, H.R. Doc. No. 103-159, vol. 1 at 672, 674 (1993). The Roosevelt Workers petitioned for certification under both components of the program, which are addressed in turn below.

A. Eligibility for Assistance to Workers in Directly Affected ("Primary") Firms

Under the NAFTA-TAA statute, as well as the TAA provisions of the Trade Act of 1974,

workers in directly affected ("primary") firms may be eligible for assistance either as "production

workers" or as "support service workers."

1. Eligibility as "Production Workers"

Under the NAFTA-TAA statute, workers are to be certified as eligible for benefits if the

Secretary of Labor determines that:

> . . . a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated, and either –
>
> (A) that –
>
> (I) the sales or production, or both, of such firm or subdivision have decreased absolutely,
>
> (ii) imports from Mexico or Canada of articles like or directly competitive with *articles produced* by such firm or subdivision have increased, and
>
> (iii) the increase in imports under clause (ii) contributed importantly to such workers' separation or threat of separation and to the decline in the sales or production of such firm or subdivision; or
>
> (B) that there has been a shift in production by such workers' firm or subdivision to Mexico or Canada of articles like or directly competitive with articles which are produced by the firm or subdivision.

19 U.S.C. § 2331(a)(1) (1994) (emphasis added). Thus, on its face, the NAFTA-TAA statute covers

displaced workers who *produced articles*.

The Labor Department denied the Roosevelt Workers' NAFTA-TAA petition based on its conclusion that the workers did not produce an article but were, rather, "engaged in services." AR 18, 27, 33-34. The agency apparently based that conclusion on its finding that "[t]he affected workers were engaged in the lifting and transportation of crude oil." AR 18. *See also* AR 10, 33-34. However, as it stands, the record supports neither the Labor Department's finding as to the nature of the work performed by the Roosevelt Workers, nor its conclusion that they provided services and did not "produce" an "article."

Although rendered in a TAA case, the recent opinion in Marathon Ashland is instructive here. Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 26 CIT ___, 215 F. Supp. 2d 1345 (2002). Much like this case, that case also involved workers formerly employed as "gaugers" who assertedly "performed the functions, *inter alia*, of testing and determining the quality of crude oil to be purchased and transported." 26 CIT at ____, 215 F. Supp. 2d at 1347.[7]   There,

---

[7]Plaintiffs' Reply Brief noted that "the court has not previously addressed whether the act of gauging oil is an activity contemplated by the statute." *See* Plaintiffs' Reply Brief at 2-3. Although that statement was true at the time it was made, neither party brought Marathon Ashland to the attention of the Court after that opinion issued. *See generally* Thomas R. Newman & Steven J. Ahmuty, Jr., Disclosing Adverse Authority, N.Y. L.J., Sept. 4, 2002, at 3 (discussing "the lawyers' responsibility to see to it that all relevant authorities are brought to the attention of the court, those supporting the position urged as well as those against it," and noting that – "just as one would advise the court of a recently decided, or found, favorable case," in fulfillment of counsel's duty to zealously represent the interests of his client – so too the ethical obligation of candor toward the court requires that counsel "disclose directly adverse authority not known to and cited by opposing counsel."). *See also* ABA Model Rules of Prof'l Conduct R. 3.3 (2002), "Candor Toward the Tribunal."

Counsels' duties of disclosure "continue to the conclusion of [a] proceeding" and cover any legal authority "in the controlling jurisdiction" (including not only decisions of relevant appellate courts, but also decisions of the same court, courts of coordinate jurisdiction and even lower courts). *See*, *e.g.*, ABA Model Rules of Prof'l Conduct R. 3.3(c) (duration of obligation to disclose);

too, the Labor Department denied the workers' petition based on its conclusion that the gaugers provided services and did not produce an article.  26 CIT at \_\_\_\_, 215 F. Supp. 2d at 1349.

But the Marathon Ashland court held that the Labor Department's negative determination was not supported by substantial evidence, because the agency drew "the unsubstantiated conclusion that the petitioning employees did not 'produce' an article" within the meaning of the statute.  26 CIT at \_\_\_\_, 215 F. Supp. 2d at 1351.  Criticizing the Labor Department for relying on "conclusory assertions provided by company officials" while ignoring "evidence presented by the petitioning workers . . . that they were involved in more than the mere transportation of crude oil, [that] directly contradicts the company officials' conclusions," the court emphasized that "[a]t best, the administrative record provides limited information discussing whether the Plaintiffs' duties as gaugers place them within the group of eligible import-impacted employees Congress intended to benefit from TAA."  26 CIT at \_\_\_\_, 215 F. Supp. 2d at 1351-53.  The Marathon Ashland court concluded that "[w]hether [the gaugers in that case] provided a service and did not participate in the 'production' of an 'article' . . . is a determination that the Secretary [of Labor] must make based on evidence in the record by discussing the duties performed by the gaugers and how their responsibilities fit into the oil production scheme of their parent company."  26 CIT at \_\_\_\_, 215 F. Supp. 2d at 1353.  The court therefore remanded the case to the Labor Department for further investigation and analysis.  26 CIT at \_\_\_\_, 215 F. Supp. 2d at 1355.

---

Disclosing Adverse Authority, N.Y. L.J., Sept. 4, 2002, at 4 (definition of "controlling jurisdiction"); Angela Gilmore, Self-Inflicted Wounds:  The Duty to Disclose Damaging Legal Authority, 43 Clev. St. L. Rev. 303, 308 (1995) (Rule 3.3 "dictates disclosure of cases decided by the same court or higher courts in the same jurisdiction").  See also Amoco Oil Co. v. United States, 234 F.3d 1374, 1378 (Fed. Cir. 2000) (criticizing counsel's "fail[ure] to cite, much less distinguish, clearly governing case law" as potential violation of Rule 3.3).

The administrative record in this case is at least as skimpy as that in <u>Marathon Ashland</u>, and warrants the same result.

As in <u>Marathon Ashland</u>, the Roosevelt Workers were employed as "gaugers," and state that they performed "a number of tasks" at well heads and crude oil tanks before the oil was purchased and readied for transport: "[c]hecking temperature, gaug[ing] the amount of crude in the tank, tak[ing] samples for gravity test[ing] and grind[ing] out for BS&W, and check[ing] the bottom of the tank for water or impurities." AR 3. *See also* AR 29 (Roosevelt Workers required "to run tests for temperature, gauge volume of crude, percentage of BS and W, volume of water separation, and sediment in the bottom of the tanks"). Indeed, according to the Roosevelt Workers' petition, if the oil passed all tests administered by the gauger, "a crude oil ticket [was] written up for that tank. . . The drivers [were then] dispatched to the location and load[ed] the crude oil on [their] truck[s] and transport[ed] it to one of three locations for refining." AR 3. On its face, the clear implication of that language from the petition is that "gaugers" are personnel separate and distinct from "drivers," who are summoned only after the gaugers have tested and approved the oil. *See also* Plaintiffs' Brief at 8 (asserting that, as gaugers, Roosevelt Workers were "directly involved in the production process for petroleum . . . *before the drivers arrive[d]* . . . to transport the oil for refining") (emphasis added).

Nevertheless, for reasons not explained in the record, the Labor Department rejected the Roosevelt Workers' descriptions of the duties of their jobs, crediting instead a company official's representations that "the workers drove trucks and would pick up or deliver crude." AR 31; *see also* CAR 13.

As the Government observes, the Labor Department may properly rely upon "unverified statements of company officials," absent "contradictory information." *See* Defendant's Brief at 26 (*citing* U.S. Steel Workers of America, Local 1082 v. McLaughlin, 15 CIT 121, 122 (1991) *and* Local 167, Int'l Molders & Allied Workers' Union v. Marshall, 643 F.2d 26, 31-32 (1st Cir. 1981)). But that is not the case here. As in Marathon Ashland, the unverified statements of the company official in this case were contradicted by the workers' descriptions of their own jobs.

Indeed, the doubt cast on the reliability of the information supplied by the company here is even greater than the doubt in Marathon Ashland, for two reasons. Not only was the information supplied by the company official in this case contradicted by that provided by the workers; in addition, the Labor Department was on notice that the company had earlier refused to cooperate with Utah state officials who were reviewing the Roosevelt Workers' petition. *See* AR 4 (documenting company's "lack of cooperation" with state official, and noting that company was "very hostile" to state official and "informed her that it was none of her business"). In fact, according to one Utah state official, the company actually gave the state *misinformation* on a critical point. *See* AR 4 (documenting company statement that workers were "taking early retirement which was not the case at all," and that one of those laid off "was only 24 years old").[8] Moreover, as discussed further below, the company official contacted by the Labor Department gave two inconsistent statements on a key point – the ownership of the oil wells where the Roosevelt Workers worked. *See* AR 31

_____

[8]The observations of the Utah state officials are difficult to reconcile with the Government's apparent confidence in claiming here that "[t]here is no evidence that Chevron Products Company officials were uncooperative or less than forthright during Labor's investigation." *See* Defendant's Brief at 26 n.10.

(Aviani initially stated that wells were "either Chevron owned or 'partner' wells," but called back later to state that "95% of the crude . . . [was] from 3rd party wells").

As in Marathon Ashland, the inconsistency between the statements of the Roosevelt Workers and statements of the company official alone would have necessitated further agency investigation of the precise nature of the gaugers' work. But, in light of the Utah state officials' experience with the company, and the company official's changing story, the Labor Department should have seen "red flags" everywhere. "The less the [Labor Department] goes beyond the unsubstantiated oral statements of company officials, the less is required of plaintiffs to rebut those statements." Former Employees of Bell Helicopter Textron v. United States, 18 CIT 323, 328 (1994). Under the circumstances of this case, it was unreasonable for the Labor Department to rely on the unverified statements of CPDS's Human Resources Manager, Ms. Aviani, without further inquiry or explanation.[9]

The Roosevelt Workers' employment in the oil industry adds another dimension to the case. Apparently anticipating an argument that, as gaugers, the Roosevelt Workers were engaged in

---

[9]See, e.g., Bell Helicopter, 18 CIT at 326 (Labor Department erred in relying on unverified statements of company officials where both officials "had serious adverse interests to acknowledging or confirming that the job losses were due to the fact that [the firm] could pay Canadians less than Americans . . . [and] . . . intended to do just that. The public relations implications alone were enough to cast a cloak of suspicion over [the firm's] responses, both in terms of veracity and completeness."); Former Employees of Barry Callebaut v. Herman, 25 CIT ____, ____, 177 F. Supp. 2d 1304, 1309-11 (2001) (Labor Department erred in accepting company's unverified questionnaire responses while failing to analyze contradictory evidence suggesting company responses were less than truthful); Swiss Indus. Abrasives I, 17 CIT at 949, 830 F. Supp. at 641 (Labor Department erred by relying exclusively on respondent company's unsubstantiated statement that imports were not in competition with domestic products); Former Employees of Kleinert's, Inc. v. Herman, 23 CIT 647, 654-55, 74 F. Supp. 2d 1280, 1288 (1999) (Labor Department erred in relying on unverified statements of company official in face of factual discrepancies in record).

"exploration or drilling for oil" rather than production processes further downstream,[10] the Government notes that – prior to certain 1988 amendments to the TAA statute – workers involved in exploration or drilling were not considered to be "producing" an article for purposes of eligibility for TAA benefits. *See* Defendant's Brief at 20 n.8 (*citing* Former Employees of Zapata Offshore Co. v. United States, 11 CIT 841 (1987) ).[11] Referring to 19 U.S.C. § 2272(b)(2) (1994) (which was added to the TAA statute in 1988 to clarify that exploration and drilling are included within the definition of "producing" oil), the Government emphasizes that "[a] similar definition was not included in the NAFTA Transitional Adjustment Assistance Program." Defendant's Brief at 20.

Although the Government does not amplify that argument, it is worth noting that the Labor Department's determinations in this case were not based on any such ground. AR 18-19, 32-35. Moreover, this appears to be an issue of first impression; and matters of statutory interpretation properly rest in the first instance with the agency charged with implementing the statute. Post hoc rationalization by litigation counsel is no substitute for the agency's own "reasoned analysis evident in the administrative record," which is what the law requires. *See generally* SKF USA Inc. v. United

---

[10]In their Reply Brief, the Roosevelt Workers assert that they are "former employees of Chevron Products Company, Roosevelt, Utah, which is a subsidiary of Chevron U.S.A., Inc., a company that engages in *the exploration and production of crude oil and natural gas*." *See* Plaintiffs' Reply Brief at 2 (emphasis added).

[11]Disputing the Roosevelt Workers claim that, as gaugers, they were "directly involved in the production process for petroleum . . . before the drivers arrive[d] . . . [to] transport the oil for refining" (*see* Plaintiffs' Brief at 8), the Government maintains that "[t]here is no evidence that the Roosevelt workers were involved in the production of crude oil, or in the exploration or drilling of crude oil." Defendant's Brief at 19-20. To the contrary, as discussed elsewhere, the record is entirely unclear as to the precise nature of the Roosevelt Workers' duties (as well as the ownership and control of the oil wells at issue, and various other pertinent facts).

States, 254 F.3d 1022, 1028 (Fed. Cir. 2001) (*citing* Burlington Truck Lines, Inc. v. United States,

371 U.S. 156, 165-69 (1962) ); Int'l Union v. Marshall, 584 F.2d at 396 (footnote omitted).

Certainly the Government's brief identified nothing in the legislative history to suggest that

the concept of "producing" an "article" was intended to be defined more narrowly for purposes of

the NAFTA-TAA program than for the TAA program.[12]   And it is telling that the Labor

Department's own "Findings of the Investigation" prepared in the NAFTA-TAA investigation in this

case assert that the Roosevelt Workers "do not produce[ ] crude oil" or engage[]  in the exploration

and production of oil or natural gas" – suggesting that the agency itself interpreted the NAFTA-TAA

statute to include exploration and drilling within the definition of "producing."  *See* AR 10.[13]

Finally, invoking Former Employees of Permian Corp. v. United States, 13 CIT 673, 674-75,

718 F. Supp. 1549, 1550-51 (1989), the Government argues that "even assuming that Congress

intended a similar definition of oil production to apply in [TAA cases and] NAFTA-TAA cases,

---

[12]To the contrary, indications are that coverage under the NAFTA-TAA program was intended to be more expansive – not more restrictive – than coverage under the TAA program.  For example, the NAFTA-TAA program extends benefits to secondarily-affected workers (*see* section III.B, below), and covers not only import competition but also shifts in production – a situation not covered by the TAA program. *See* Statement of Administrative Action, H.R. Doc. No. 103-159, vol. 1 at 674 (1993) (secondarily-affected workers); 19 U.S.C. § 2331(a)(1)(B) (1994) (shifts in production). *See also* H.R. Doc. No. 103-159, vol. 1 at 672 (1993) (NAFTA-TAA program intended to reflect "the best aspects of existing programs").

[13]Even if it were determined that the NAFTA-TAA statute does not include exploration and drilling for oil within the definition of "producing," the statute requires that – where petitioning workers are found to be ineligible for NAFTA-TAA benefits – the Labor Department is to automatically evaluate their eligibility for benefits under the TAA statute (which clearly includes exploration and drilling within the definition of "producing"). *See* 19 U.S.C. § 2331(c)(2) (1994). Thus, a determination that the Roosevelt Workers' duties constituted exploration and/or drilling should – in and of itself – pose no insurmountable hurdle to their cause.

courts have held that services unrelated to the locating and extracting of oil from the ground do not involve the production of oil or natural gas" for purposes of eligibility for trade adjustment assistance. Defendant's Brief at 20-21. However, as the court recently observed in Marathon Ashland, Permian involved employees of a firm that transported and marketed crude oil purchased from *unaffiliated companies*. *See* Marathon Ashland, 26 CIT at ____, 215 F. Supp. 2d at 1354 n.10 (*citing* Permian, 13 CIT at 673, 718 F. Supp. at 1549). As discussed above, the evidence in this case is at best ambiguous both as to the exact duties of the Roosevelt Workers and as to the ownership and control of the oil wells where they labored. In short, it is in fact far from clear whether those wells were in fact owned and controlled by "unaffiliated companies."

Even more fundamentally, Marathon Ashland casts doubt on the Government's narrow interpretations of the statute, the legislative history, and the relevant case law in support of its argument that gaugers provide services falling outside the trade adjustment assistance laws. *See generally* Marathon Ashland, 26 CIT at _____, 215 F. Supp. 2d at 1354-55.

The Labor Department has an affirmative obligation "to conduct a factual inquiry into the nature of the work performed by the petitioners to determine whether it amounted to that of service or that of production." Former Employees of Shot Point Servs. v. United States, 17 CIT 502, 507 (1993) (citations omitted). Indeed, more generally still, the agency "has an affirmative duty to investigate whether petitioners are members of a group which Congress intended to benefit" from trade adjustment assistance legislation. Hawkins Oil and Gas, 17 CIT at 129, 814 F. Supp. at 1114 (citations omitted). As in Marathon Oil, the Labor Department here failed to properly discharge those duties. *See generally* Marathon Oil, 26 CIT at ____, 215 F. Supp. 2d at 1351-52 ("At best, the

administrative record provides limited information discussing whether the Plaintiffs' duties as gaugers place them within the group of eligible import-impacted employees Congress intended to benefit from TAA. As such, [the] court cannot conclude that Labor . . . satisfied its requirement of reasonable inquiry, especially when viewed in light of the remedial purpose of the statute.").

Much like Marathon Ashland, this action too must be remanded to enable the Labor Department to address the issues raised above (for purposes of its "production workers" analysis as well as its other analyses, discussed in greater detail below). Among other things, the Labor Department shall conduct a thorough investigation of the duties of gaugers such as the Roosevelt Workers, in the context of the oil production scheme of CPDS-related entities;[14] and the agency shall make a reasoned determination on the record as to whether or not the gaugers' work constituted the provision of a service or the "produc[tion]" of an "article" within the meaning of the statute.

## 2. Eligibility as "Support Service Workers"

Even if the Labor Department makes a reasoned determination, supported by substantial evidence in the record, that the Roosevelt Workers do not "produce" an "article," they nevertheless are eligible for certification as "support service workers," if:

> (1) their separation was caused importantly by a reduced demand for their services from a parent firm, a firm otherwise related to the subject firm by ownership, or a firm related by control;

---

[14]Where, as here, "the company under investigation is part of a larger corporate entity, the [Labor Department] has a duty of providing a description of the [company's] organizational structure and of inquiring into how the subject company fits into the organization." Linden Apparel Corp., 13 CIT at 470, 715 F. Supp. at 381. Such an investigation in this case will inform not only the agency's determinations on the Roosevelt Workers' eligibility for certification as "production workers," but also its determinations on their status as "service workers" and "secondarily-affected workers."

(2) *the reduction in the demand for their services originated at a production facility whose workers independently met the statutory criteria for certification*; and

(3) the reduction directly related to the product impacted by imports.

*See* AR 19 (emphasis added). *See generally* <u>Bennett v. U.S. Sec'y of Labor</u>, 20 CIT 788, 792 (1996) (citations omitted); <u>Abbott v. Donovan</u>, 6 CIT 92, 100-01, 570 F. Supp. 41, 49 (1983) ("<u>Abbott I</u>") (while legislative history and statute on its face are silent as to coverage of service workers, agency has interpreted statute to cover them in certain circumstances).

In this case, the Labor Department ruled that the Roosevelt Workers did not qualify as "service workers" based on its findings that "[t]here were no NAFTA-TAA certifications in effect for workers of Chevron Products Company" and that the Roosevelt Workers "lifted and transported crude oil that was primarily purchased from unaffiliated firms."[15]  AR 10, 19, 34.  But, here again, the Labor Department's findings and conclusions are not supported by substantial evidence in the record.

The first ground for the Labor Department's denial of "service worker" status concerns the Roosevelt Workers' relationship, if any, to "a *production facility* whose workers independently met the  statutory criteria for certification." *See* AR 19 (emphasis added).  It is not clear from the record – which has scant evidence on the point – what the Labor Department determined to be the relevant

---

[15]Significantly, the Labor Department did not cite the source of the oil as grounds for denying "service worker" status until its determination on the Roosevelt Workers' application for reconsideration – after an agency investigator spoke with a company official who retracted her earlier statement on the same subject to assert "that 95% of the crude . . . [was] from 3rd party wells." *Compare* AR 18-19 *to* AR 32-35; AR 31. *See also* <u>Linden Apparel Corp.</u>, 13 CIT at 470, 715 F. Supp. at 381 (rejecting Labor Department determination as "flawed" where agency investigation failed to uncover significant fact until after workers filed application for reconsideration).

"production facility" for purposes of its "service workers" analysis. The agency's initial determination is entirely silent on the point; and the determination denying the Roosevelt Workers' request for reconsideration identifies only "Chevron Products Company" by name. AR 18-19, 34. *See also* AR 10.

In focusing on Chevron Products Company, the Labor Department apparently relied on information supplied by the company official, Ms. Aviani, who stated that drivers at the Roosevelt Facility transport crude oil to a particular Chevron Products Company facility for refining. CAR 13. But, according to the Roosevelt Workers themselves, the oil that they tested was destined for "one of three locations for refining." AR 3. If that statement is accurate, there are at least two other potential "production facilities" that the Labor Department should have considered; moreover, nothing in the record confirms that the particular refinery named by Ms. Aviani was one of the three "locations" to which the Roosevelt Workers referred. Because the agency apparently failed to identify all potentially relevant facilities, the Labor Department's investigation was inadequate to rule out the possibility that workers at at least one of the three "locations" might have "independently met the statutory criteria for certification." As discussed more fully above, the Labor Department simply was not free to rely on information supplied by Ms. Aviani, in the face of conflicting information supplied by the Roosevelt Workers (to say nothing of the other indicia casting doubt on the reliability of information provided by the company).

Although not without doubt, it appears that the Labor Department's assertion that the Roosevelt Workers "lifted and transported crude oil that was primarily purchased from unaffiliated firms" reflects the agency's consideration of another possibility: the possibility that the relevant

"production facility" might be *oil wells* – the source of the crude oil – rather than the *refineries* where the crude oil was processed. *See* AR 34.[16]  However, in making its finding that the oil "was primarily purchased from unaffiliated firms," the agency again relied on information supplied by the company official – on a point on which the company official herself reversed course.

When the Labor Department investigator contacted Ms. Aviani, he "asked if the drivers were [picking up or delivering crude] only for *Chevron wells*, and she said . . . the *wells* were either *Chevron owned or 'partner' wells*." AR 31 (emphasis added).  Only later did she call back to say "that 95% of the crude picked up by the drivers in Roosevelt [was] from *3rd party wells* in which Chevron did not have a financial interest, other than purchasing the crude." AR 31 (emphasis added).  The Government argues that there was no reason for the Labor Department to view Ms. Aviani's second statement "as anything other than a follow up call to provide more accurate information." Defendant's Brief at 26.  To the contrary, Ms. Aviani's 180° change of position on such a key fact should alone have sparked further investigation.[17]  And, as discussed above, there

---

[16]Particularly in light of the Roosevelt Workers' description of their responsibilities as "gaugers," this would seem to be entirely appropriate.  As the discussion in section III.A.1 (above) suggests – based on the little evidence now in the record concerning (1) the Roosevelt Workers' duties, (2) their roles *vis-a-vis* exploration and drilling on the one hand vs. refining on the other, and (3) the organizational structure of CPDS and related corporate entities – it seems plausible to consider the Roosevelt Workers as part of either or both of two separate but related "production" processes (one "upstream" and the other "downstream"):  the exploration, drilling and "production" of crude oil, or – alternatively – the "production" of refined petroleum products.

[17]In their opening brief, the Roosevelt Workers argued that it was improper for the Labor Department to rely blindly on Ms. Aviani's second statement, both because it directly contravened her initial statement and "[s]ince well production is generally 'leased' by Chevron." Plaintiffs' Brief at 12.  The Government characterizes that statement as "bald and unsupported." *See* Defendant's Brief at 25-26.  But the Labor Department was on notice of the existence of such leases at least as early as the Roosevelt Workers' NAFTA-TAA petition. *See* AR 3 (stating that, as price of domestic

were a number of other "red flags" as well.  In addition, the Labor Department's exclusive focus on

oil *wells* may be inappropriate, in light of the Roosevelt Workers' statement that they worked at

"crude oil tanks" as well as "well head[s]" – which raises yet another potential, albeit implicit,

inconsistency between Ms. Aviani's statements and those of the workers.  *See* AR 3.

This action must be remanded to enable the Labor Department – if it determines that the

Roosevelt Workers do not "produce" an "article" – to conduct a proper investigation to determine

the appropriate "production facility" for purposes of its "service workers" analysis.  And, just as the

agency is obligated – in defining the "appropriate subdivision" for purposes of its "production

workers" analysis – "to choose a subdivision that best effectuates the purposes of [trade adjustment

assistance legislation] in light of the circumstances of the individual case" (*see* Int'l Union v.

Marshall, 584 F.2d at 397), so too the Labor Department is obligated – for purposes of its "service

workers" analysis – to choose a production facility "that best effectuates the purposes" of the

NAFTA-TAA statute given the facts of the case at bar.  Further, the reasons for the agency's

"production facility" determination "must be evident in the record."  *Id*. (agency's choice of plant

as "appropriate subdivision" rejected where not the product of reasoned analysis in record).[18]

---

crude oil plummeted, "producers were released from lease obligations," and referring to "sale of leases" and "changed leases").  Simply stated, the agency should have thoroughly investigated the ownership and control of the oil wells in question.  It will have a second opportunity to do so on remand.

[18]*Cf.* Lloyd v. U.S. Dep't of Labor, 637 F.2d 1267, 1275 (9th Cir. 1980) ("The mechanical adoption of the plant as the appropriate subdivision without reasoned analysis is improper.  The circumstances of each case must be examined to determine the appropriate subdivision in that case.") (citation omitted).

Moreover, after the Labor Department identifies the appropriate "production facility" (or facilities), it must determine whether workers there independently met the statutory criteria for certification. The agency thus applied the wrong test in this case when it found that "[t]here were no NAFTA-TAA certifications in effect for workers of Chevron Products Company." *See* AR 34; *see also* AR 10 (noting "no manufacturing facilities of Chevron Products Company, (CPDS) . . . under existing certification or ongoing investigation"). The question is not whether there was a certification already *in effect*. Instead, what the Labor Department must determine is whether workers at the relevant production facility met the criteria for certification – whether or not they actually sought it. *See generally* Marathon Ashland, 26 CIT at ____, 215 F. Supp. 2d at 1355 (noting that even if "Marathon Ashland did not serve [its parent company's] currently certified facilities, Marathon Ashland still may have served its parent company's other production facilities whose workers independently meet the statutory criteria"). *Cf.* Champion Aviation, 23 CIT at 354 (where petitioning workers alleged that they lost their jobs at company's Facility A because its production was shifted to company's Facility B which – in turn – shifted to a third company facility in Mexico, mere fact that workers at Facility B had not filed for adjustment assistance was insufficient basis on which to deny petitioning workers' claim); Bennett v. U.S. Sec'y of Labor, 20 CIT at 792 (sustaining denial of TAA to service workers where "no independent certification of [relevant] production workers could have [been] obtained.").

### B. Eligibility for Assistance to Workers in Secondary Firms

The Roosevelt Workers contend, in the alternative, that – if they are not eligible for assistance as workers in a directly-affected firm – they are instead eligible for assistance as "secondarily-affected workers."[19] *See* Plaintiffs' Brief at 2, 10-12; Plaintiffs' Reply Brief at 1, 3-4. As the Labor Department noted in this case, under the Statement of Administrative Action accompanying the NAFTA Implementation Act, a worker group may qualify for benefits as secondarily-affected workers if the following requirements are met:

(1)      The subject firm must be a supplier – such as of components, unfinished or semifinished goods – to a firm that is directly affected by imports from Mexico or Canada or shifts in production to those countries; or

(2)      The subject firm must assemble or finish products made by a directly-impacted firm; and

(3)      The loss of business with the directly-affected firm must have contributed importantly to worker separations at the subject firm.

AR 37; *see also* Statement of Administrative Action, H.R. Doc. No. 103-159, vol. 1 at 674-75 (1993).[20]

---

[19]*See*, *e.g.*, Plaintiffs' Reply Brief at 3 (asserting that Roosevelt Workers "qualify as secondarily affected workers because Chevron Products Co. is a supplier of crude oil for processing at Chevron Products Company, Salt Lake Refinery. At that refinery, the crude oil undergoes further processing as part of a production operation that results in refined petroleum products. The services performed by plaintiffs were an essential step in petroleum processing.").

[20]This appears to be a case of first impression. There is no judicial precedent on claims to "secondarily-affected worker" status under the NAFTA-TAA statute.

Relying on three pieces of asserted "evidence," the Labor Department denied the Roosevelt

Workers' petition for certification as secondarily-affected workers. Specifically, the Labor

Department found:

> The workers of Chevron Products Company in Roosevelt, Utah are engaged in the employment related to lifting and transporting crude oil. The investigation revealed that the majority of crude oil lifted and transported by the Roosevelt Workers [was] purchased from 3rd parties by Chevron and transported to the refinery. The workers of the subject firm do not supply components, unfinished, or semifinished goods to a directly-affected ("primary") firm nor did they assemble or finish products made by a directly-affected firm.

AR 37. "Based on this . . . *evidence*," the agency concluded, "workers engaged in the provision of

the service of lifting and transporting crude oil at Chevron Products Company, Roosevelt, Utah, .

. . do not qualify" as secondarily-affected workers. AR 37 (emphasis added). However, like its

determinations on the Roosevelt Workers' eligibility for assistance as "production workers" and

"service workers," the Labor Department's determination on their status as secondarily-affected

workers also is not supported by substantial evidence in the record.

As discussed above, this action must be remanded to permit the Labor Department to

properly investigate the reliability of the first two pieces of "evidence" on which it here relies – the

precise nature of the Roosevelt Workers' jobs, and the ownership and control of the oil wells (and

perhaps oil tanks) in question. Thus, those "facts" as found by the Labor Department cannot

constitute "evidence" in support of the agency's determination.[21]

_____

[21]Indeed, it is not clear why the ownership and control of the oil wells would be relevant to the Roosevelt Workers' claim as "secondarily-affected workers." In contrast, for example, to a claim for benefits as "service workers" (where petitioners must establish that their separation was attributable to a reduced demand for their services from a parent firm or other closely-related entity), there is no apparent requirement that the former employer of "secondarily-affected workers" be in

The third and final piece of asserted "evidence" (quoted above) is not truly evidence at all, but rather an ultimate conclusion of mixed fact and law – essentially a paraphrase of the first and second criteria for secondarily-affected worker status (as outlined above), prefaced with the phrase "The workers of the subject firm do not . . ." Thus, it too cannot constitute "evidence" in support of the agency's determination. In short, not only is the Labor Department's determination on secondarily-affected worker status not supported by "substantial evidence" in the record; on its face, it appears that it is supported by no evidence at all.[22]

Nor is it clear whether the Labor Department's determination was otherwise "in accordance with law." In its brief, the Government concedes that the term "supplier" is not defined in the Statement of Administrative Action accompanying the NAFTA Implementation Act. The Government nevertheless argues that the Labor Department properly determined that the Roosevelt Workers were not "suppliers." AR 24-25.

On remand, in reconsidering its determination on the Roosevelt Workers' status as secondarily-affected workers, the Labor Department will have the opportunity – if appropriate – to fully articulate its definition of any key terms, such as "supplier," and how they apply in this case. *See generally* SKF USA Inc., 254 F.3d at 1028 (explaining rationale for rejection of appellate

---

any way related by ownership or control to the "directly-affected firm" which was impacted by increased imports (or a shift in production).

[22]Curiously, the Labor Department's determination on the Roosevelt Workers' claim to secondarily-affected worker status states that "[t]he investigation revealed that none of the requirements, (1), (2) or (3) have been met." *See* AR 37. However, the determination cites no evidence relating directly to criterion (3). Certainly there is no reference to evidence bearing on whether imports "contributed importantly" to the Roosevelt Workers' separations. Remand will afford the agency the opportunity to address criterion (3) more fully, as appropriate.

counsel's post hoc rationalization for agency determination) (*citing* <u>Burlington Truck Lines, Inc.</u>, 371 U.S. at 165-69); <u>Int'l Union v. Marshall</u>, 584 F.2d at 396 (footnote omitted) (agency determination must be "the product of a reasoned analysis evident in the administrative record").  In addition, the agency shall fully explore the precise nature of the Roosevelt Workers' jobs and their role *vis-a-vis* the production and supply chain, to ascertain whether they can fairly be said to be "suppliers" of crude oil, or – alternatively – whether they are sufficiently aligned with the refining function that they may be said to be "finishers" of oil and petroleum products.

## C.  Miscellaneous Alleged Irregularities

In addition to their attacks on the substantive merits of the Labor Department's determinations, the Roosevelt Workers also raise various irregularities in the conduct of the investigation.  They argue, for example, that the agency erred by relying on its TAA investigation in addressing their NAFTA-TAA claim, and that the agency should have issued a NAFTA-TAA questionnaire to elicit information "specifically . . . about imports from Canada and/or Mexico." *See* Plaintiffs' Brief at 9; Plaintiffs' Reply Brief at 2.  They further contend that the Labor Department should have sought clarification of "the nexus between imports and the subsequent layoffs" in this case, and that the agency's determinations improperly failed to consider the findings of Utah state officials.  *See* Plaintiffs' Brief at 13; Plaintiffs' Reply Brief at 4.

The general thrust of the Government's defense is "harmless error."  The Government argues, for example, that the Labor Department's decision not to issue a NAFTA-TAA questionnaire does not warrant remand because "[t]he precise level of imports from Mexico or Canada would not alter the bases for Labor's denial of certification."  *See* Defendant's Brief at 23; *but see* <u>Alcatel</u>

Telecomms., 24 CIT at \_\_\_\_, No. 98-03-00540, Slip Op. 00-88, 2000 Ct. Intl. Trade LEXIS 90, at

*17-20 (use of NAFTA-TAA questionnaire in TAA case is problematic and "probative of the

adequacy of the investigation," although not necessarily fatal).

Similarly, the Government maintains that a remand for consideration of the state's findings

is unnecessary because the only "new information" in those findings was the state's determination

that the Roosevelt Workers were laid off due to imports of crude oil from Canada.[23]   The

Government points out that the Roosevelt Workers' application for reconsideration included a

similar statement about the link between imports and layoffs, which was noted by the Labor

---

[23]A copy of Utah's preliminary Findings and Recommendations are appended to Plaintiff's Brief as Exhibit 3. The Government objects both to that Exhibit and to Plaintiffs' Exhibit 1 (a copy of a Labor Department amended certification of eligibility for trade adjustment assistance for workers of Chevron U.S.A. Production Company, Business Products and Services, Department of Chevron Services Company, Division of Chevron U.S.A., Inc.). The Government argues that the exhibits are "extra record" evidence which is "not properly before [the] Court." *See* Defendant's Brief at 18-19. In any event, the Government contends, consideration of the exhibits would not warrant a different result. *Id*. at 21-23, 27-28. As discussed above, the Government argues that the state's findings were, in effect, considered by the Labor Department. And the Government dismisses Plaintiffs' Exhibit 1 as "inapposite," asserting that the situation of the Chevron workers in the other case is distinguishable from that of the Roosevelt Workers here. *Id*. at 22.

To be sure, judicial review of the Labor Department's determinations in actions such as this are confined to the administrative record. *See, e.g.*, Champion Aviation, 23 CIT at 350 (citations omitted). However, the fact that this action must be remanded for other reasons means that the Labor Department will have the opportunity to expand the administrative record – certainly to include the Findings and Recommendations of the State of Utah, and (if appropriate) the findings and determinations of the Labor Department in any relevant investigations concerning other related Chevron entities.

Department in its determination on the application; but, again, the Government argues, "the existence or level of imports from Canada [would] not change the bases" for the Labor Department's determinations in this case.[24]  Defendant's Brief at 27-28.

In any event, for all the reasons detailed in sections III.A and III.B above, this action must be remanded to the Labor Department for further investigation and analysis.  Accordingly, it is not necessary now to reach the specifics of the miscellaneous irregularities in the investigation.  The agency will have ample opportunity to cure any such defects on remand.[25]

---

[24]Significantly, the Government does not argue that the Labor Department has no obligation to consider a state's findings.  *See* 19 U.S.C. § 2331(b)(2)(B)(ii) (requiring Governor to transmit preliminary findings to Secretary of Labor "for action" in accordance with statute).

[25]The irregularities identified in Plaintiffs' briefs are not the only manifestations of the cursory nature of the agency's investigation.  For example, the Labor Department investigator's memo documenting his contacts with CPDS's Human Resources Manager is deficient in a number of respects.  *See* AR 31.  That memo – which bears the docket number not of the NAFTA-TAA investigation, but rather of the TAA investigation – purports to memorialize the substance of two critical phone conversations.  However, the memo is itself undated; and it does not specify either the date of the first conversation (which apparently occurred in "May, 2000") or even the month or year of the second conversation (which is said only to have occurred sometime "later").  In short, the memo is not a contemporaneous record memorializing the investigator's contacts, and is of dubious reliability.

Similarly, although the Roosevelt Workers' petition asserted a claim to benefits as "secondarily-affected workers," the Labor Department's initial determination failed to consider that claim.  *Compare* AR 1-2 *with* AR 10, 18-19, 24- 28.  The agency considered the petitioners' potential status as secondarily-affected workers for the first time only after they filed their application for reconsideration.  *See* AR 36-38.  The error is likely attributable to the agency's initial decision not to conduct a new investigation in response to the NAFTA-TAA petition, but rather to rely on the results of its earlier TAA investigation.  Because the TAA program does not afford relief to secondarily-affected workers, the agency's TAA investigation did not address the elements of such a claim.  The oversight is nevertheless telling.  *See generally* Linden Apparel Corp., 13 CIT at 470, 715 F. Supp. at 381 (rejecting Labor Department determination as "flawed" where agency investigation failed to uncover significant fact until after workers filed application for reconsideration).

### IV.  Conclusion

As detailed above, the Labor Department failed to fulfill its affirmative obligation to conduct its investigation "with the utmost regard" for the interests of the Roosevelt Workers.  *See* Stidham v. U.S. Dep't of Labor, 11 CIT at 551, 669 F. Supp. at 435 (citations omitted).  Accordingly, this action must be remanded for further investigation and analysis of the Roosevelt Workers' petition for certification of eligibility to apply for transitional adjustment assistance under the NAFTA-TAA statute.

It remains to be seen whether further investigation and analysis will change the outcome; it may or may not.  But, even if a more detailed inquiry does not alter the result, at least the Roosevelt Workers will be afforded a thorough determination which is supported by substantial evidence and is the product of a reasoned analysis evident in the administrative record.  *See* Int'l Union v. Marshall, 584 F.2d at 396, 397-98.  They are entitled to no less.

A separate order will enter accordingly.

_____
Delissa A. Ridgway
Judge

Decided:   October 28, 2002
                New York, New York

_____

Even the very face of the file betrays the sloppiness of the investigation.  The agency's official "Notice of Negative Determination Regarding Application for Reconsideration" is incomplete.  *See* AR 32-35.  The last line of the penultimate page of the notice stops mid-sentence, and the following (final) page begins "Conclusion."

While they may be relative inconsequential considered in isolation, the cumulative effect of such defects is to reinforce the impression of an investigation which was *pro forma* at best.