**Slip Op. 03-96**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

FORMER EMPLOYEES OF CHEVRON   :
 PRODUCTS COMPANY,       :

        _Plaintiffs_,  :

              Court No. 00-08-00409

       v.    :

UNITED STATES SECRETARY OF LABOR, :

        _Defendant._  :
_____

[Plaintiffs' motion for judgment on the agency record granted in part, and action remanded to Defendant for further proceedings consistent with opinion.]

Dated:  July 28, 2003

Meeks & Sheppard (Ralph H. Sheppard and Diane L. Weinberg), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Henry R. Felix); Louisa Reynolds, Office of the Solicitor, United States Department of Labor, Of Counsel; for Defendant.

## OPINION

RIDGWAY, Judge:

In this action, Plaintiffs – former employees of the Roosevelt Terminal unit of Chevron Products Company, a division of Chevron, U.S.A. – contest the determinations of the U.S. Department of Labor ("Labor Department") both denying their petition for transitional adjustment assistance under the North American Free Trade Agreement ("NAFTA") Implementation Act, and

denying them benefits as "secondarily-affected workers" under the Statement of Administrative Action accompanying the NAFTA Implementation Act.

Before the Court are the Labor Department's determinations pursuant to remand in Chevron I, 26 CIT _____, 245 F. Supp. 2d 1312 (2001), as well as Plaintiffs' Motion for Judgment on the Agency Record, which requests "a judgment . . . certif[ying] plaintiffs as eligible to apply for NAFTA-TAA or qualified as a member of a secondarily affected group" or, in the alternative, a remand to the Labor Department for further investigation. Memorandum in Support of Plaintiffs' Motion for Judgment of the Agency Record ("Pls.' Remand Brief") at 17; Plaintiffs' Reply to Defendant's Memorandum in Partial Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("Pls.' Remand Reply Brief") at 2, 8.   Defendant's Memorandum in Partial Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Def.'s Remand Brief").

Jurisdiction lies under 28 U.S.C. § 1581(d)(1) (1994).[1]  For the reasons set forth below, Plaintiffs' Motion for Judgment on the Agency Record is granted in part, and the action is remanded to the Labor Department – yet again – for further proceedings consistent with this opinion.

## I.  The History of This Case

Like various other Trade Adjustment Assistance ("TAA") and NAFTA-TAA cases before this Court in recent years,[2] this case has taken on a life of its own.  Although the Government

---

[1]While all statutory citations in this opinion, save where expressly noted, are to the 1994 version of the U.S. Code, the pertinent text of the cited provisions was the same at all times relevant herein.

[2]Chevron I included a brief overview of the United States' trade adjustment assistance laws, which are generally designed to address jobs lost due to increased international trade.  See Chevron I, 26 CIT at _____, 245 F. Supp. 2d at 1317-18, and authorities cited there.  Benefits available under

pointedly characterizes <u>Chevron I</u> as "the Court's first remand order" (Def.'s Remand Brief at 3),

a brief review of the history of the case reveals that the Labor Department has now had no fewer than

seven "bites at the apple," and puts the agency's remand determinations here at bar in proper

perspective.

Until their separation on October 31, 1999, Plaintiffs (the "Roosevelt Workers") were

employed as "gaugers" by Chevron Products Company ("CPDS"), in Roosevelt, Utah, working at

---

the program established by the Trade Act of 1974 ("the TAA program") are denominated "*trade* adjustment assistance" ("TAA benefits"), while those available under the NAFTA Implementation Act, including the related Statement of Administrative Action ("the NAFTA-TAA program"), are referred to as "*transitional* adjustment assistance" ("NAFTA-TAA benefits"). *Id.*

As <u>Chevron I</u> explained, the TAA and NAFTA-TAA programs are very similar. Compare Trade Act of 1974 § 221 *et seq*, 19 U.S.C. § 2271 *et seq.* (1994) *with* NAFTA Implementation Act § 501, 19 U.S.C. § 2331 *et seq.* (1994). *See generally* <u>Chevron I</u>, 26 CIT at ____, 245 F. Supp. 2d at 1317-18, and authorities cited there. Much like the TAA program, the NAFTA-TAA program entitles eligible workers to benefits including employment services, appropriate training, job search and relocation allowances, and income support payments. *See* Statement of Administrative Action Accompanying NAFTA Implementation Act, H.R. Doc. No. 103-159, vol.1 at 673-674 (1993); 19 U.S.C. § 2331(d) (1994).

There are some differences between the two statutes' scope of coverage, however. Obviously, NAFTA-TAA coverage is more limited, to the extent that the job losses must be related to Canada or Mexico. But, in another respect, coverage is significantly broader. While the TAA program offers assistance only where job losses result from increased imports, the NAFTA-TAA program also covers job losses due to shifts in production to facilities in Canada or Mexico. *See* <u>Chevron I</u>, 26 CIT at ___ n.12, 245 F. Supp. 2d at 1327 n.12, and authorities cited there.

Finally, the NAFTA-TAA statute requires that – where petitioning workers are found to be ineligible for NAFTA-TAA benefits – the Labor Department is to automatically evaluate their eligibility for benefits under the TAA statute. *See* 19 U.S.C. § 2331(c)(2) (1994).

Since the events at issue here, the new Trade Adjustment Assistance Reform Act of 2002 has been enacted, consolidating the TAA and NAFTA-TAA programs. *See* Trade Adjustment Assistance Reform Act of 2002 § 123, Pub. L. No. 107-210, 116 Stat. 933, 944 (2002). Notably, as discussed in greater detail in section III.A. below, the new statute extends coverage for "shifts in production" beyond Canada and Mexico, to include all other countries.

"well head[s] and or crude oil tanks" to perform various tasks to determine whether crude oil should be purchased – "[c]heck[ing] temperature, gaug[ing] the amount of crude in the tank, tak[ing] samples for gravity test and grind out for BS&W, and check[ing] the bottom of the tank for water or impurities." AR3.[3] If the samples were satisfactory and all tests were passed, "a crude oil run ticket [was] written up" and "drivers were dispatched to the location . . . [to] load[ ] the crude oil on [their] truck[s] and transport[ ] it" to the refineries. AR 3.

According to the Roosevelt Workers, between 1997 and 1999, an influx of lower-cost crude oil imported from Canada led to dramatic cutbacks in domestic crude oil production (including a reduced demand for gaugers such as the Roosevelt Workers), resulting in the termination of their employment. AR 3.

---

[3]Because this action was remanded to the agency, there are now two separately-paginated administrative records – the initial Administrative Record, and the Supplemental Administrative Record. Moreover, because this action includes confidential information, there are two versions of each of those records. Citations to the public versions of the Administrative Record and the Supplemental Administrative Record are noted as "AR ___," and "SAR ___." Citations to the confidential versions are noted as "CAR ___" and "CSAR ___," respectively.

The 44-page Administrative Record was before the Court in Chevron I. The sole difference between the public and confidential versions of that record is that pages 13 through 15 – the "Business Confidential Data Request" questionnaire completed by CPDS's Human Resources Manager – are omitted from the public version, because they include business confidential information.

The 113-page Supplemental Administrative Record was compiled on remand, and is deceptively thick. Aside from the 14-page Remand Determination, the bulk of the record consists of 71 pages of boilerplate-laden contracts, with redundant amendments. While the contracts, several internal memoranda from the Labor Department, and two CPDS job descriptions are designated as confidential, the few remaining documents constitute the public record.

## A.  The TAA Petition

The Roosevelt Workers immediately filed a petition for certification of eligibility to apply for trade adjustment assistance ("TAA") under the Trade Act of 1974. *See* AR 4.  Just a few weeks later, in late November 1999, they got what they thought was good news.  The Labor Department notified them that they were already eligible for TAA benefits, under a previously-filed petition which had been granted in July 1999.  *See* AR5.

The Roosevelt Workers' relief was short-lived.  As officials at the Utah Department of Workforce Services made plans to proceed with training for the gaugers, the officials were dismayed to discover that the men were not on the list of workers eligible for benefits.  *See* AR 4.  Upon further inquiry, the state officials learned that the pre-existing certification, issued in July 1999, covered only Chevron Production Company – not the Roosevelt Workers' employer, CPDS.  *See* AR 5, 32; 64 FR 43722.

The Labor Department had made a mistake.  The Roosevelt Workers were not covered by the pre-existing certification.

## B.  The Resubmitted TAA Petition

State officials resubmitted the Roosevelt Workers' original TAA petition to the Labor Department in early January 2000, requesting that it be considered "either as a new petition or . . . as an amendment to the . . . [existing] certification" covering Chevron Production Company.  *See* AR5.

The Labor Department's investigation consisted of a 3-page standard form TAA "Business Confidential Data Request" questionnaire, which was sent to CPDS, the Roosevelt Workers' former

employer. *See* AR 11. CPDS's Human Resources Manager, Irene D. Aviani, marked-up the 3-page questionnaire, describing the Roosevelt Workers, in essence, as truck drivers, and providing certain other information reflecting, *inter alia*, (1) decreasing quantities of oil processed at the Roosevelt Terminal; (2) decreasing levels of employment at the Roosevelt Terminal; and (3) increasing levels of imports of crude oil by CPDS. *See* CAR 13-15.

Based solely on the questionnaire response, the agency denied the Roosevelt Workers' petition for TAA, finding that they performed a service and thus did not produce an article within the meaning of the TAA statute. AR 16. The Labor Department also found that the reduction in demand for the workers' services did not originate at a production facility whose workers independently met the statutory criteria for certification. AR 16-17.

## C.  **The NAFTA-TAA Petition**

While assisting the Roosevelt Workers with their appeal of the Labor Department's denial of the TAA petition, the Utah state officials learned for the first time "that Chevron had been buying Canadian oil." AR 4. In light of the Canadian imports, a new petition was filed – this time seeking NAFTA-TAA benefits. AR 1-5 (Petition for NAFTA Transitional Adjustment Assistance, with attachments.) It is that NAFTA-TAA petition, and the ensuing proceedings, which are directly at issue here. In that petition, the Roosevelt Workers sought certification as workers from a "primary firm" or, in the alternative, as "secondarily-affected workers." Workers in "secondary firms" may be eligible if they either are "supplier[s]" to "primary firms," or they "assemble" or "finish" products made by "primary firms." AR 37; *see also* Statement of Administrative Action, H.R. Doc. No. 103-159, vol. 1 at 674-75 (1993).

Accompanying the NAFTA-TAA petition was an internal memorandum prepared by a representative of the Utah Workforce Services Department, chronicling the events leading up to the filing of that petition, and documenting a significant "lack of cooperation from Chevron." AR 4. The memo noted that CPDS was "very hostile" to the state official who contacted the company concerning the Roosevelt Workers' TAA petition, stating that "it was none of her business." AR 4. The memo further noted that one CPDS official who had provided the Roosevelt Workers with much information "did not want them to use his name as he [was] worried" about retaliation. AR 4.

Also forwarded to the Labor Department were the preliminary Findings and Recommendations of the State of Utah, including the state's determination that "[t]he Chevron Company is receiving all crude oil products from Canada, causing the company in Roosevelt, Utah to layoff workers." *See* Memorandum from State of Utah Department of Workforce Services to U.S. Department of Labor re: NAFTA-TAA Petition Preliminary State Investigation/Chevron (CPDS) (April 10, 2000), included as Exhibit 3 to Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record ("Plaintiffs' Initial Brief").

With no further investigation whatsoever – and, indeed, apparently without reviewing even the findings and determinations made by the State of Utah[4] – the Labor Department denied the Roosevelt Workers' NAFTA-TAA petition. Relying exclusively on its file on the TAA petition, the Labor Department ruled that the gaugers were "engaged in lifting and transportation of crude oil to domestic refineries" and thus "were engaged in services and did not produce an article" within the

---

[4]*See* Defendant's Response in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record at 27 (conceding that "it is unclear from the record whether the agency decisionmaker considered the preliminary findings prior to issuing his decision").

meaning of the statute. AR 10; AR 18. In addition, the Labor Department found that the reduction in demand for the gaugers' services did not "originate at a production facility whose workers independently [met] the statutory criteria for certification." AR 19. The Labor Department completely failed to address the Roosevelt Workers' alternative claim to benefits as "secondarily-affected workers."[5]

### D. The Application for Reconsideration of the NAFTA-TAA Petition

The Roosevelt Workers promptly sought reconsideration of the denial of their NAFTA-TAA petition. AR 29. The Labor Department's review on reconsideration consisted of a single phone call from a Labor Department investigator to Ms. Aviani, CPDS's Human Resources Manager, sometime in May 2000. Asked about "the type of work being performed by the[ ] workers at the Roosevelt Utah facility," Ms. Aviani stated that "the workers drove trucks and would pick up or deliver crude." AR 31. When the investigator asked whether the drivers did pick ups and deliveries only for Chevron wells, Ms. Aviani initially stated that the wells were "either Chevron owned or 'partner' wells." *See* AR 31. Some time later, she called back to retract her earlier statement, indicating instead that "95% of the crude picked up by the drivers in Roosevelt . . . [was] from 3rd party wells in which Chevron did not have a financial interest, other than purchasing the crude." AR 31.[6]

---

[5]As Chevron I noted, the agency's failure to address the Roosevelt Workers' potential status as "secondarily-affected workers" was "likely attributable to the agency's initial decision not to conduct a new investigation in response to the NAFTA-TAA petition, but rather to rely on the results of its earlier investigation. Because the TAA program does not afford relief to secondarily-affected workers, the agency's TAA investigation did not address the elements of such a claim. The oversight is nevertheless telling." 26 CIT at _____ n.25, _____ F. Supp. 2d at _____ n.25.

[6]The only record of that phone call is an undated memorandum – bearing the wrong docket number – consisting of a mere seven lines of text, and drafted sometime well after-the-fact. For the

In late July 2000, the Labor Department denied the Roosevelt Workers' application for reconsideration. This time – although CPDS's earlier three-page questionnaire response (*see* section I.B., *supra*) confirmed the Roosevelt Workers' claims of imports of crude oil during the relevant period, and although the record was entirely devoid of any contradictory evidence on the point– the Labor Department inexplicably found that there were "no company imports of crude oil." AR 33. The agency also reiterated its prior conclusion that the Roosevelt Workers were "engaged in lifting and transporting crude oil," and thus provided a service and did not produce an article within the meaning of the statute. AR 32-35.

In addition, the Labor Department determined that the Roosevelt Workers did not qualify for benefits as service workers based on its findings that (1) "[t]here were no NAFTA-TAA certifications in effect for workers of Chevron Products Company," and (2) the Roosevelt Workers "lifted and transported crude oil that was primarily purchased from unaffiliated firms." AR 32-35. The Labor Department rejected the Roosevelt Workers' claim of eligibility as secondarily-affected workers as well, finding that (1) the Roosevelt Workers' duties were related to "lifting and transporting crude oil"; (2) "the majority of crude oil lifted and transported by the Roosevelt Workers [was] purchased from 3rd parties"; and (3) the Roosevelt Workers did not "supply components, unfinished, or semifinished goods to a directly-affected ('primary') firm nor did they assemble or finish products made by a directly-affected firm." AR 37.

---

reasons detailed in <u>Chevron I</u>, the memo clearly "is not a contemporaneous record memorializing the investigator's contacts, and is of dubious reliability." 26 CIT at _____ n.25, 245 F. Supp. 2d at 1334 n.25.

**E.  The Filing of This Action and the Government's Consideration of a Voluntary Remand**

The Roosevelt Workers filed a timely appeal with this Court, contesting both the Labor Department's denial of their NAFTA-TAA petition and its decision to decline reconsideration of that denial, as well as the agency's separate determination denying them benefits as secondarily-affected workers. *See* Complaint ¶¶ 1,3,4,5.

The Government sought and was granted a 40-day extension of time to file its Answer.  On the eve of the new deadline, another extension of time was sought – and granted – on the strength of the representation that "the Department of Labor [was then] considering . . . filing a motion for a voluntary remand, which the parties agree[d] could lead to a settlement that would be in the interests of justice."  Consent Motion to Extend Time, dated Nov. 9, 2000.

Neither the "settlement" nor the motion for a voluntary remand materialized.  Presumably after a studied and deliberate review of the file to that date, and after using every day of the extension granted to it, the Government advised that it had elected to stand on the administrative record as is. The Roosevelt Workers thereafter sought judgment on the agency record, and the matter was fully briefed.

**F.  The Decision in Chevron I and the Remand to the Agency**

Although the opinion speaks for itself, it is fair to say that <u>Chevron I</u> was a fairly scathing critique of the Labor Department's investigatory methods, its findings and its determinations in this case.  Finding that the agency's investigation was sloppy, incomplete, and "*pro forma* at best," <u>Chevron I</u> concluded that the Labor Department "failed to fulfill its affirmative obligation to conduct

its investigation 'with the utmost regard' for the interests of the Roosevelt Workers." Chevron I, 26 CIT at ___, 245 F. Supp. 2d at 1334 (citations omitted). Granting in part the Roosevelt Workers' motion, Chevron I remanded the action to the Labor Department for further investigation. Chevron I, 26 CIT ___, 245 F. Supp. 2d 1312.

## G. The *De Facto* Voluntary Remand

Pursuant to Chevron I, the Labor Department's final determinations of remand were to be filed no later than January 31, 2003. On that day, in lieu of filing the remand results, the Government sought an extension of time. The Government represented that the Labor Department had forwarded its draft remand results to the Justice Department only three days earlier, and that – following "extensive discussions" concerning those results – "both agencies agreed that *additional investigation* [was] needed concerning the qualification of the former employees of Chevron Products Company as a secondarily-affected worker group." Defendant's Consent Motion for an Extension of Time to File Remand Results, dated January 31, 2003 (emphasis added).

Based on the Government's assurances that the additional time would "ensure that a complete record [was] before the Court" (*id.*), the Government was granted what amounted to a 35-day voluntary remand for further investigation. Yet the record eventually filed with the Court includes no evidence of any such investigation. Indeed, the Government has conceded that – contrary to the implication of its motion for an extension of time – there was no further "investigation," although the agencies did do further review and analysis of the information already on file before the remand results were filed with the Court. *See* Audiotape: Teleconference of Court with Counsel for Plaintiffs and Defendant (July 2, 2003) ("7/2/03 Audiotape").

**H.  The Labor Department's Remand Determination and the Roosevelt Workers' Motion**

In the remand results filed with the Court, the Labor Department yet again concluded that the Roosevelt Workers are ineligible for benefits because they were not engaged in production but, rather, performed a service.  SAR 104-105.  The agency determined that the Roosevelt Workers cannot be certified as service workers because their separation was not "caused importantly by a reduced demand for their services by an affiliated production facility whose workers could have been certified as eligible to apply for NAFTA-TAA."  SAR 105.  Further, the Labor Department determined that the Roosevelt Workers do not meet the requisite criteria to qualify for benefits as secondarily-affected workers.  The Roosevelt Workers have once more moved for judgment on agency record, and matter is fully briefed.

## II. Standard of Review

Judicial review of a Labor Department determination denying certification of eligibility for trade assistance benefits is confined to the administrative record.  *See*, *e.g.*, Former Employees of Champion Aviation v. Herman, 23 CIT 349, 350, (*citing* 28 U.S.C. § 2640(c) (1999) *and* Int'l Union v. Reich, 22 CIT 712, 716, 20 F. Supp. 2d 1288, 1292 (1998)).  The agency's determination must be sustained if it is supported by substantial evidence in the record and is otherwise in accordance with law.  19 U.S.C. § 2395(b) (1994); Former Employees of Swiss Indus. Abrasives v. United States, 17 CIT 945, 947, 830 F. Supp. 637, 639 ("Swiss Indus. Abrasives I") (*citing* Former Employees of General Elec. Corp. v. U.S. Dep't of Labor, 14 CIT 608, 611 (1990)).

The Labor Department's findings of fact are thus conclusive if they are supported by substantial evidence.  *See* Former Employees of Galey & Lord Indus., Inc. v. Chao, 26 CIT ___,___,

219 F. Supp.2d 1283, 1285-86 (2002) (citation omitted). However, substantial evidence is more than a "mere scintilla"; it must be enough to reasonably support a conclusion. *Id.* at 1286 (*citing* Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (1987)). And "[a]n assessment of the substantiality of record evidence must take into account whatever else in the record fairly detracts from its weight." Former Employees of Swiss Indus. Abrasives v. United States, 19 CIT 649, 651 (1995) (*citing* Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)) ("Swiss Indus. Abrasives II").

Moreover, all rulings based on the agency's findings of fact must be "in accordance with the statute and not . . . arbitrary and capricious"; to that end, "the law requires a showing of reasoned analysis." Gen'l Elec. Corp., 14 CIT at 611 (*quoting* Int'l Union v. Marshall, 584 F.2d at 396 n.26). In short, although it is clear that the scope of review here is narrow, and that a court is not free to substitute its judgment for that of the agency, it is equally clear that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Former Employees of Alcatel Telecomms. v. Herman, 24 CIT 655, 658-659, (*quoting* Motor Vehicle Mfrs. Assn'n v. State Farm Mut. Auto Ins., 463 U.S.29, 43, 103 S. Ct. 2856, 77 L.Ed.2d 443 (1983) (citations omitted)). Where "good cause [is] shown," a case must be remanded for further investigation and analysis. *See* 19 U.S.C. § 2395(b) (1994); Former Employees of Linden Apparel Corp. v. United States, 13 CIT 467, 469, 715 F. Supp. 378, 381 (1989); Swiss Indus. Abrasives I, 17 CIT at 947, 830 F. Supp. at 640.

### III.  Analysis

As Chevron I observed, the Labor Department "has an affirmative duty 'to conduct a factual

inquiry into the nature of the work performed by the petitioners to determine whether it amounted to that of a service or that of production.'" Chevron I, 26 CIT at ___, 245 F. Supp.2d at 1327-28 (*quoting* Former Employees of Shot Point Servs. v. United States, 17 CIT 502, 507 (1993)). Moreover, more generally, "the agency 'has an affirmative duty to investigate whether petitioners are members of a group which Congress intended to benefit' from trade adjustment assistance legislation." *Id.* at 1328 (*citing* Former Employees of Hawkins Oil & Gas Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 129, 814 F. Supp. 1111, 1114 (1993) ). The remand results filed with the Court reveal that the Labor Department has, once again, failed to properly discharge those duties.

As Chevron I explained, the NAFTA-TAA program includes two separate components, providing benefits both for workers in firms "directly affected by imports from . . . Canada" and for "workers in secondary firms that supply or assemble products by firms that are directly affected." 26 CIT at ___, ___ F. Supp. 2d at ___ (*quoting* Statement of Administrative Action, H.R. Doc. No. 103-159, vol. 1 at 672, 674 (1993)). The Labor Department's remand results addressed the Roosevelt Workers' petition for certification under both components of the program, which are addressed in turn below.

### Eligibility for Assistance to Workers in Directly Affected ("Primary") Firms

Under the NAFTA-TAA statute, as well as the TAA provisions of the Trade Act of 1974, workers in directly affected ("primary") firms may be eligible for assistance either as "production workers" or as "support service workers."

**Eligibilityfor Certification as "Production Workers"**

The NAFTA-TAA statute provides, in relevant part, that workers are to be certified as eligible for benefits if the Secretary of Labor determines that:

> . . . a significant number of proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated, and either –
>
> (A) that –
>
> (i) the sales or production, or both, of such firm or subdivision have decreased absolutely,
>
> (ii) imports from Mexico or Canada of articles like or directly competitive with *articles produced* by such firm or subdivision have increased, and
>
> (iii) the increase in imports under clause (ii) contributed importantly to such workers' separation or threat of separation and to the decline in the sales or production of such firm or subdivision; . . .

19 U.S.C. § 2331(a)(1) (1994) (emphasis added). Thus, on its face, the NAFTA-TAA statute covers, *inter alia*, workers involved in *production* who are displaced due to *imports from Canada or Mexico*.


**(1) Production**

Drawing heavily on Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 26 CIT ___, 215 F.Supp.2d 1345 (2002) ("Marathon Ashland I"), which also involved gaugers, Chevron I rejected the Labor Department's determination that the Roosevelt Workers were ineligible for NAFTA-TAA benefits, concluding that the administrative record supported "neither the Labor Department's finding as to the nature of the work performed by the Roosevelt Workers, nor its conclusion that they provided services and did not 'produce' an 'article.' " 26 CIT at ____, 245 F.

Supp. 2d at 1323.

Accordingly, Chevron I instructed the Labor Department to, *inter alia*, "conduct a thorough investigation of the duties of gaugers such as the Roosevelt Workers, in the context of the oil production scheme of CPDS-related entities" and to "make a reasoned determination on the record as to whether or not the gaugers' work constituted the provision of a service or the 'produc[tion]' of an 'article' within the meaning of the statute." Chevron I, 26 CIT at ___, 245 F. Supp. 2d at 1328.

On remand, the Labor Department sent faxed a 2-page letter to CPDS headquarters in California, requesting information on "the primary function of the Roosevelt Terminal," "the organization of [CPDS] and its relationship to its parent company," and the relationship between the Roosevelt Terminal and CPDS in Roosevelt, Utah," as well as copies of the "position descriptions or the job duties" for the Roosevelt Workers, and "copies of the contracts and or purchase orders" for the locations where they worked. SAR 2-3. In addition, the agency requested information on CPDS imports of crude oil during 1998 and 1999. *Id.*

Based on the Roosevelt Worker's own descriptions of their duties, the job descriptions provided by CPDS, and the agency's review of the definition of "gauger" in the Dictionary of Occupational Titles, the Labor Department determined that "the duties performed by the [Roosevelt Workers] are related to the transportation of crude oil after the oil has been produced: i.e., the crude oil was already out of the ground by the time the Roosevelt facility gaugers tested it." AR 104-105.

Implicitly, the Labor Department's determination suggests that, in this context, "production" is defined as ending the moment that crude oil clears the surface of the earth. But the agency still has not advanced *any* legal or factual rationale in support of such a definition. Conclusory statements are no substitute for "reasoned analysis evident in the administrative record," which is

what the law requires. *See generally* <u>SKF USA Inc. v. United States</u>, 254 F.3d 1022, 1028 (Fed. Cir. 2001) (citations omitted). It simply is not enough to say what "production" *is not*. The agency must affirmatively and definitively explain – in this context – what production *is*, and why.[7]

Not only is the Labor Department's determination that the "production" of crude oil ends the moment that it exits the ground unsupported by any factual or legal basis, it also conflicts directly

---

[7]The Labor Department's continued refusal to articulate its reasoning is particularly egregious given the industry at issue here. Aside form the agriculture industry, the oil and gas industry is the *only* other industry that the trade adjustment assistance laws expressly address. Specifically, the TAA statute was amended in 1988 to specify that "a firm, or appropriate subdivision of a firm, that engages in exploration or drilling for oil or natural gas, *or otherwise produces oil or natural gas*, shall be considered to be *producing articles* directly competitive with imports of oil and with imports of natural gas." 19 U.S.C. § 2272 (b)(2)(B) (1994) (emphases added). *See generally* <u>Former Employees of Marathon Ashland Pipeline v. Chao</u>, Slip Op. 03-64, 17-20, 27 CIT ____, ____, ____ F. Supp. 2d ____, ___ (June 11, 2003) (discussing 1988 amendments).

The legislative history of the 1988 amendment yields (relative to all other industries) a wealth of information on Congress' understanding of the structure and nature of the industry, and evidences Congress' intent to be (again, relatively speaking) expansive in the definition of "production." Yet the Labor Department has repeatedly refused to articulate its definition of "otherwise produces . . .," even within the meaning of that statute.

Of course, the Roosevelt Workers petitioned for relief not under the TAA statute, but under the NAFTA-TAA statute. Although the Government initially sought to make much of the fact that language comparable to the 1988 amendment was not included in the NAFTA-TAA statute, <u>Chevron I</u> pointed out that the Labor Department's own findings appeared to reflect an agency interpretation of the NAFTA-TAA statute to reflect the rationale of the 1988 TAA amendment; that the Government's argument to the contrary amounted to *post hoc* rationalization by litigation counsel; that there was nothing in the legislative history of the NAFTA-TAA statute to suggest that Congress intended to define "production" more narrowly for purposes of the NAFTA-TAA program than for the TAA program, and – most importantly – that the NAFTA-TAA statute requires that, where petitioning workers are found to be ineligible for NAFTA-TAA benefits, the Labor Department is to automatically evaluate their eligibility under the TAA statute. *See* <u>Chevron I</u>, 26 CIT at ____ n.13, 245 F. Supp. 2d at 1327 n.13. While it is not entirely clear, it appears that the Government now concedes this point.

with Marathon Ashland II.  *See* Former Employees of Marathon Ashland Pipeline v. Chao, Slip Op. 03-64, 13, 27 CIT ___, ___ F. Supp. 2d ____ (June 11,2003).  In light of the Labor Department's intransigence, the    Marathon Ashland court's searching opinion looked to various agency publications, as well as the *Dictionary of Business and Economics*, and the text and history of the legislation to determine whether or not the gaugers were engaged in the  "production" of crude oil.

The Marathon Ashland court pointed out, for example, that the Labor Department's own *Career Guide to Industries* classifies "gaugers" under the general heading of "production occupations" within the field of oil and gas extraction.  Marathon Ashland II, Slip O. 03-64 at 13, 27 CIT at ____, ____ F. Supp. 2d at _____.  The court further noted that, elsewhere, under the heading "Oil and Gas Extraction," the same publication explains: "*Pumpers* and their helpers operate and maintain motors, pumps, and other surface equipment that force oil from wells and regulate the flow . . . . *Gaugers* measure and record the flow, taking samples to check quality."  Slip Op. 03-64 at 12, 27 CIT at ____, ____ F. Supp. 2d at ____ (emphasis in original).  As the Marathon Ashland court observed, "Labor's descriptions of the oil production process indicate a common understanding that the production process includes the point at which the crude is pumped into 'separation and storage tanks.'  Furthermore, at least one bureau within [the agency] places the work done by gaugers squarely within the production process, along with pump system operators."  Slip Op. 03-64 at 14, 27 CIT at ___, ___ F. Supp. 2d at ___.

The Marathon Ashland court also noted that the Labor Department had described the gaugers in that case as "responsible for quality control," but had failed to explain why it did not consider "quality control" to constitute production.  As the court pointed out, the *Dictionary of Business and Economics* defines "quality control" as a function which is generally considered part of the

production process. Slip Op. 03-64 at 16, 27 CIT at ____, ____ F. Supp. 2d at ____.

Further buttressing its reasoning with an analysis of relevant legislative history (Slip Op. 03-64 at 17-20, 27 CIT at ____, ____ F. Supp. 2d at ____), the Marathon Ashland court concluded that the gaugers in that case were engaged in the production of crude oil. Slip Op. 03-64 at 20, 27 CIT at ____, ____ F. Supp. 2d at ____.

Logic and the principle of *stare decisis* compel the same result here. As in Marathon Ashland II, the Labor Department here denied the Roosevelt Workers' petition on the grounds that – as gaugers – they were not engaged in "production." And here, as there, the agency has failed and refused to articulate a definition for "production" in the context of the crude oil industry, or even to place on the record any facts or rationale underpinning its assertion that the production process ends the moment the crude clears the earth. Here too, as in Marathon Ashland II, the Labor Department has described the work of the gaugers essentially as "quality control," SAR 101, 104, 110, but has then failed to explain why the quality control function is not an integral part of the production process in the crude oil industry, as it is in other industries.[8]

In light of Marathon Ashland II, the Government urges that this case be remanded – yet again – to the Labor Department, to give the agency "an opportunity to reconsider its finding that the Roosevelt workers were not engaged in the production of crude oil, but rather provided support services." Def.'s Remand Brief at 11. The Government also seeks a remand to allow the Labor Department to "reexamine its finding in the context of the TAA statute, if necessary," in light of the

---

[8]Moreover, the Labor Department's finding that the Roosevelt Workers' duties are related to transportation is contradicted by the evidence, relied on by the agency itself, that gaugers perform a quality control function.

requirement, under 19 U.S.C. § 2331(c)(2)(1994), that eligibility for benefits be considered under TAA when NAFTA-TAA eligibility is not found. *Id*.

However, the Labor Department has had more than ample time to consider the similarities and differences between the gaugers in Marathon Ashland and the Roosevelt Workers here. Indeed, Chevron I expressly drew the attention of the parties and their counsel to the parallels between the cases, and – several weeks after the issuance of that opinion – the Court wrote counsel, providing them with copies of the Labor Department's remand determination in Marathon Ashland, and urging them to confer with their Marathon Ashland counterparts, to stay abreast of relevant developments. *See*, *e.g.*, Chevron I, 26 CIT at _____ n.7, _____ F. Supp. 2d at _____ n.7 (noting that neither party brought Marathon Ashland I to the attention of the court in this action); Letter from the Court to Counsel, dated Nov. 19, 2002. Similarly, the Court immediately notified counsel here of the issuance of Marathon II, "so that it [might] be reflected (as appropriate)" in their briefs on the remand results. Letter from the Court to Counsel (June 12, 2003). The Court then granted the Government's request for a one week extension of time for "additional intra-governmental coordination . . . required to complete its response brief to reflect the [Marathon II] decision." *See* Defendant's Unopposed Motion for An Extension of Time, dated June 20, 2003.

Yet neither the Labor Department's remand results nor the Government's Remand Brief suggests any reason why the general principle derived from Marathon Ashland II – that the function of gaugers is an integral part of the crude oil production process – should not apply with equal force here. Indeed, the Government has acknowledged that Marathon Ashland II "undermines the central reasoning underlying [the Labor Department's] determination that the Roosevelt workers were not involved in the production of oil." Def.'s Remand Brief at 8. Further, the Government has candidly

conceded that the Marathon Ashland gaugers and the Roosevelt Terminal gaugers are the "same worker group,"adding: "Applying the examination of the court in Marathon to the facts of this case, you are left with the inescapable conclusion that these workers should be qualified as production workers." *See* Audiotape of the Court's June ___, 2003 Teleconference with Counsel.

Particularly in light of the Government's concessions, it is unclear what further purpose a remand on this point would serve. The Labor Department already has had seven opportunities to make a reasoned determination as to what constitutes "production" in the crude oil industry, and to apply that finding to the Roosevelt Workers, and yet it has failed to do so. Similarly, the Government has had ample opportunity to distinguish the Marathon Ashland gaugers from the Roosevelt Terminal gaugers, and yet has declined to do so.

Nor is there any apparent purpose to remanding this matter to permit the Labor Department to reconsider its finding in light of the TAA statute. To be sure, the agency has had ample time since the issue was first raised in Chevron I to consider the implications of any differences between the TAA statute and the NAFTA-TAA statute as applied to the oil and gas industry. *See* Chevron I, 26 CIT at ____ n.12-13. Yet the remand results and the Government's Remand Brief are silent on the point.

As explained in Chevron I and summarized in note 8 above, and as the Government apparently now acknowledges, even if the Labor Department were somehow to interpret the NAFTA-TAA statute to exclude gaugers from the definition of "production," the statute would obligate the agency to then consider the Roosevelt Workers' eligibility under the TAA statute, directly implicating Marathon Ashland II. In short, whether the Roosevelt Workers are analyzed initially under the NAFTA-TAA statute, or under the TAA statute, the ultimate result seems clear.

Applying the rationale of <u>Marathon Ashland II</u> to the record in this case, the gaugers here – like their Marathon Ashland counterparts – are engaged in the "production" of crude oil.

## (2) **Imports**

To be certified as eligible for NAFTA-TAA benefits, a worker who was engaged in production must also establish that he was displaced due to imports from, or shifts in production to, Mexico or Canada. 19 U.S.C. § 2331(a)(1)(A). Although the linchpin of the Labor Department's negative determination on remand was "the nature of the work being conducted by the Roosevelt facility worker group" (SAR 110), the agency also addressed the issue of the level of imports.

Emphasizing that – for purposes of NAFTA-TAA – only imports from NAFTA countries are relevant, the Labor Department found that, "[f]rom 1998 to 1999, aggregate U.S. imports of crude oil increased, while U.S. imports from Mexico and Canada decreased." SAR 110. But the significance of those findings is entirely unclear.

Even for purposes of a NAFTA-TAA analysis, what matters in this case is not whether or not U.S. imports of crude oil from Mexico and/or Canada increased *in general*, but – rather – whether imports from those countries by CPDS *in particular* increased. And, indeed, the Labor Department's remand determination states that the agency in fact "confirmed that [CPDS] did import crude oil from Canada during the [relevant] time period." AR 110. The Government nevertheless urges that this action be remanded – yet again – to permit the Labor Department to "investigate the extent to which Chevron imported crude oil from Canada during the relevant review period." Def.'s Remand Brief at 12.

The Government explains that, because the Labor Department "determined that Chevron's

imports of crude oil from Canada [were] irrelevant in view of its finding that the Roosevelt workers are not production workers," it "does not appear that *precise data* regarding Chevron's crude oil imports were obtained by [the agency]." *Id*. (emphasis added).[9] The Government asserts that, "[o]n remand, Labor will collect this data as it is relevant to determine whether imports contributed importantly to the Roosevelt worker separations." *Id*.

However, as the Government's hedging suggests, the administrative record is by no means devoid of information on CPDS's crude oil imports – either from Canada, or in general. As the remand determination itself reflects, the Labor Department has independently verified that CPDS imported crude oil from Canada in the specific years of interest. SAR 110. That confirms the claims of the Roosevelt Workers themselves, which must also be credited – particularly where, as here, there is no evidence to the contrary. *See*, *e.g.*, AR 1 (Roosevelt Workers checked box, attributing job losses to imports from Mexico or Canada); AR 3 (Roosevelt Workers attested to imports of "crude from Canada via a pipeleine" starting "[i]n the fall of 1997 . . . and . . .increas[ing] every year since").

To the extent that the Labor Department has failed to date to compile what is – in its eyes – sufficiently "precise data" on Canadian imports for purposes of a NAFTA-TAA analysis, the agency has no one but itself to blame. As detailed above, the Labor Department has had multiple opportunities to obtain the relevant data. Incredibly, even on remand following Chevron I, the Labor

---

[9]The Labor Department's position here is reflective of a much greater problem – the agency's "piecemeal" approach to TAA and NAFTA-TAA investigations in general. In reviewing a Labor Department determination, it is often impossible to tell whether the fact that a particular element of a claim is not mentioned means that the element has been satisfied, or only that the agency has not investigated or analyzed it. This "cherry-picking" approach is fundamentally inconsistent with Congressional intent and the remedial nature of the trade adjustment assistance statutes.

Department asked CPDS only about crude oil imports in general. The agency failed to ask specifically about imports from Canada. SAR 3.

Apart from the evidence on imports from Canada, there is also record evidence on CPDS's crude oil imports in general, and it too is undisputed. The initial questionnaire completed by CPDS's Human Resources Manager provided data establishing increasing imports of crude oil in the relevant years leading up to the separation of the Roosevelt Workers. CAR 13. That information was corroborated by another CPDS official on remand. SAR 5.

Because the Labor Department is required to consider the Roosevelt Workers' eligibility under the TAA statute if they are determined to be ineligible for NAFTA-TAA benefits, 19 U.S.C. § 2332(c)(2), the Roosevelt Workers' eligibility for assistance does not depend on the country of origin of the competing imports. Thus, as production workers, the Roosevelt Terminal gaugers will be eligible for benefits whether the Labor Department determines that the imports that contributed importantly to their separation were from Canada or Mexico, or from anywhere else in the world. It is therefore unclear what additional investigation is required.

In sum, the relevant evidence on the record may be relatively scant, but that is the fault of the Labor Department itself. And what evidence there is, is consistent, uncontroverted and telling. The information provided by CPDS's Human Resources Manager indicates that the Roosevelt Terminal experienced a steady decline in crude oil processing from 1997 through 1999, at the same time CPDS experienced a massive surge in crude oil imports. CAR 13. Another CPDS official confirmed that CPDS imported crude oil in 1998 and 1999. SAR 5. During the same period, a substantial percentage of Roosevelt Terminal employees, including the petitioners here, were

terminated. CAR 13.  In addition, there are the Roosevelt Workers' own, uncontradicted statements that increased imports of crude oil resulted in the decline in crude oil production in the Uinta basin, leading to their separation. *See* Complaint ¶¶ 1, 2; AR 3.

The Roosevelt Workers urge that the Labor Department be ordered to certify them as eligible for benefits. Pls.' Remand Brief at 16-17.  However, this is a close case, and certification is a relatively extreme measure.  It is not entirely clear that, taken as a whole, the uncontroverted evidence now on the record is sufficient to constitute "substantial evidence" that imports contributed importantly to the Roosevelt Workers' separation, or to establish under which statute certification would be warranted.

Under these circumstances, and particularly in light of the assurances given by counsel for the Government in the Court's July 2, 2003 teleconference with counsel, it cannot be said with certainty that one last, very brief, remand would be futile.  *See* 7/2/03 Audiotape.

### Eligibility for Certification as "Support Service Workers" or "Secondarily-Affected Workers"

As noted above, the Roosevelt Workers contend – in the alternative – that they are eligible for benefits as "support service workers," or as "secondarily-affected workers" pursuant to the Statement of Administrative Action accompanying the NAFTA Implementation Act.

In light of the conclusion above that the Roosevelt Workers were engaged in the production of crude oil, there is little reason now to reach the merits of the Labor Department's remand determinations on the gaugers' alternative claims for relief.

It is worth noting, however, that the Government has asserted – now, for the first time in this action, and as a matter of first impression – that the Court lacks subject matter jurisdiction to review the Labor Department's determinations on "secondarily-affected worker" status, because that assistance program is "based on a Presidential Statement of Administrative Action rather than on NAFTA or the Trade Act." SAR 111.

While the question would be a fascinating issue of first impression, it would likely also be a matter of last impression. The remand to the agency on the issue of imports may moot further action in this case; and, as noted above, the newly-enacted Trade Adjustment Assistance Reform Act of 2002 incorporates into the statute the "secondarily-affected worker" language from the NAFTA-TAA statute, so the issue will not be presented in the future.

## IV. **Conclusion**

As detailed above, the Labor Department erred in its determination that the Roosevelt Workers were not engaged in the production of crude oil, whether under the NAFTA-TAA statute or the TAA statute. Similarly, the agency has repeatedly failed and refused to seek relevant data and to make a determination as to whether imports – from Canada, or elsewhere – contributed importantly to the Roosevelt Workers' separation. Out of an abundance of caution and in an exercise of restraint, the Labor Department will be accorded one final, brief, opportunity to do so. All remaining issues are reserved pending further order of the Court.

Accordingly, Plaintiff's motion for judgment on the agency record is granted in part, and this action is remanded to Defendant for further proceedings in conformity with this opinion, with its final determination on remand to be filed with the Court no later than September 2, 2003. No extensions will be granted.

So ordered.

_____
Delissa A. Ridgway
Judge

Decided:   July 28, 2003
           New York, New York

<u>ERRATA</u>

<u>Former Employees of Chevron Products Company v. United States Secretary of Labor</u>, Court No. 00-08-00409, Slip Op. 03-96, dated July 28, 2003.

Page 1:     In names of counsel, replace "for Plaintiff." with "for Plaintiffs."

Page 2:     In lines 3-4, replace "<u>Chevron I</u>, 26 CIT ____, 245 F. Supp. 2d 1312 (2001)," with "<u>Former Employees of Chevron Prods. Co. v. United States</u>, 26 CIT ___, 245 F. Supp. 2d 1312 (2002) ("<u>Chevron I</u>"),".

              In lines 10-11, delete "Defendant's Memorandum in Partial Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Def.'s Remand Brief")."

Page 3:     In lines 1-2, replace "(Def.'s Remand Brief at 3), a" with "(Defendant's Memorandum in Partial Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Def.'s Remand Brief") at 3 ), a".

              In line 2 of second paragraph of footnote 2, replace "§ 221 *et seq*," with "§ 221 *et seq*.,".

              In the last sentence of footnote 2, delete "as discussed in greater detail in section III.A below,".

Page 8:     In the last line of footnote 5, replace "___ F. Supp. 2d at ___ n.25" with "245 F. Supp. 2d at 1334 n.25".

Page 11:    In line 6, replace "determinations of remand" with "determinations on remand".

Page 12:    In line 10, replace "agency record, and matter is fully briefed." with "the agency record, and the matter is fully briefed."

Page 14:    In line 12, replace "___ F. Supp. 2d at ___" with "245 F. Supp. 2d at 1322-23".

Page 15:    In line 4, replace "number of proportion" with "number or proportion".

Page 16:    In line 7, delete "sent".

              In line 14, replace "Worker's" with "Workers' ".

              In line 18, replace "AR" with "SAR".

Page 17:    In line 2 of footnote 7, replace "Aside form" with "Aside from".

In line 8 of footnote 7, replace "Slip Op. 03-64, 17-20" with "Slip Op. 03-64 at 17-20".

Page 18: In lines 1-2, replace "Slip Op. 03-64, 13, 27" with "Slip Op. 03-64 at 13, 27".

In line 8, replace "Slip O." with "Slip Op.".

Page 20: In line 9, replace " ___ F. Supp. 2d at ___ n.7" with "245 F. Supp. 2d at 1324 n.7".

In line 12, replace "Marathon II" with "Marathon Ashland II".

In line 15, replace "[Marathon II]" with "[Marathon Ashland II]".

Page 21: In line 4, replace "Audiotape of the Court's June___, 2003 Teleconference with Counsel." with "7/2/03 Audiotape."

In lines 14-15, replace "26 CIT at ___ n.12-13." with "26 CIT at ___ nn.12-13, 245 F. Supp. 2d at 1326-27 nn.12-13.".

In line 17, replace "note 8" with "note 7".

Page 22: In line 17, replace "AR" with "SAR".

Page 23: In line 13, replace "pipleine" with "pipeline".

Page 24: In line 10, replace "§ 2332(c)(2)" with "§ 2331(c)(2)".

Page 26: In line 10, replace "statute" with "Statement of Administrative Action".

Page 27: In line 1, replace "Plaintiff's" with "Plaintiffs' ".

August 18, 2003